THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN WALTON WINN, Plaintiff in Error.

*Opinion filed February 16, 1927.*

1. CRIMINAL LAW—*when defendant cannot object to admission of exhibits because improperly seized.* A defendant cannot object to the admission in evidence of certain exhibits on the ground that they were seized in violation of his constitutional rights where he has made no motion to have the articles returned to him before the trial, as the court will not stop the progress of the trial to determine whether exhibits, which are otherwise competent, were taken from the defendant by proper search and seizure.

2. SAME—*when opinion evidence is not admissible.* Opinion evidence is not admissible on a question within the range of ordinary intelligence and observation, and in a murder trial a physician testifying as an expert witness will not be permitted to answer a hypothetical question as to whether a person in the physical condition described in the question would be able to strike fatal blows, which the evidence shows were inflicted by a machinist's hammer, where the jury are able to determine, from facts and circumstances in evidence as to the defendant's actions at the time, whether he was able to strike the blows.

3. SAME—*what instructions are proper where one of two defendants testifies in own behalf.* Where one of two defendants being tried for murder testifies in her own behalf but the other does not testify, the fact that the defendant who testified is mentioned by name in many of the instructions for the defendants while the other is mentioned in only a few cannot be regarded as unduly emphasizing the fact that the latter did not testify in his own behalf, where the instructions were given at the joint request of both defendants and where the court instructs the jury that a defendant is not required to testify in his own behalf and that his neglect to do so should not create any presumption against him.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. EMANUEL ELLER, Judge, presiding.

ROCCO DESTEFANO, (ELWYN E. LONG, of counsel,) for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, JAMES B. SEARCY, and GEORGE E. GORMAN, (EDWARD E. WILSON, and CLARENCE E. NELSON, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

This writ of error was granted to review a judgment of the criminal court of Cook county by which John Walton Winn was adjudged guilty of murder and sentenced to death.

Soon after 6:30 o'clock in the morning of December 30, 1925, John Pluskota on his way to work found the dead body of a man lying in the snow on the west side of Brandon avenue near Ninety-fourth street. The police were called and removed the body to Brown's morgue, where it was identified as that of Albert Nusbaum. In the forenoon of the same day Elizabeth Nusbaum, Albert's wife, was arrested at their son's house, and Delila Martin, Edward Grant Goff and Marion Stringham at Delila Martin's house. John Walton Winn was arrested at Crown Point,

Indiana, at five o'clock in the afternoon by the sheriff of Lake county, and at 9:30, having waived extradition, was brought to Chicago and delivered to the sheriff of Cook county. On January 8, 1926, all these persons were indicted for the murder of Nusbaum and on February 15 were put on their trial. Delila Martin, Goff and Stringham having entered pleas of guilty testified for the prosecution and Elizabeth Nusbaum testified in her own defense. Winn did not testify. He and Mrs. Nusbaum were found guilty. Mrs. Nusbaum was sentenced to imprisonment for life and is prosecuting a separate writ of error.

The assignments of error and brief of the plaintiff in error question the sufficiency of the evidence to establish the guilt of the plaintiff in error beyond a reasonable doubt and the correctness of the court's rulings in admitting and rejecting evidence and in instructing the jury.

The facts shown by the evidence are the following: Albert Nusbaum was sixty-three years old, and his wife, Elizabeth, sixty. They had been married forty-two years. Four children were born to them. Two of them, twins, died in infancy; one, a daughter, died at about the age of twenty-five years; and a son, forty-one years old, survived. Nusbaum was a farmer in Indiana for several years after their marriage and then moved to Elkhart, Indiana, where he was a carpenter. Afterward he and his wife moved to Chicago, where they lived for twenty-nine years, and he was a carpenter. She kept house for her husband and kept roomers and boarders and did all her own work and washing for boarders. She testified that up to the time of his death he treated her pretty well, but that they had heated arguments about property. In 1923, and afterward, they had serious disagreements and quarrels. Strong language and threats were used but no physical violence. They lived at 9238 Baltimore avenue, and Mrs. Nusbaum owned 3292 Baltimore avenue and 2947 Ninety-sixth street, only a few blocks away. This latter place was rented by De-

lila Martin, who lived there with her little daughter, ten years old. She had been separated from her husband three years. Stringham was boarding with her and had been doing so for more than three years. Winn had worked for Nusbaum for a year about 1915 and had boarded at his house. Mrs. Nusbaum had become acquainted with him during that time and a friendship developed between them, which continued down to the occurrences of December, 1925. She had a deep interest in him. She met him from time to time at different places. During the last two or three years Mrs. Martin had been a go-between for them. He and Mrs. Martin both borrowed money from Mrs. Nusbaum and re-paid some of it. The greatest amount she ever lent Winn was $300, which he re-paid. He owed her $60 or $70 at the time of the trial. There is no evidence that he had any employment except that of a gambler. He was forty-six years old. Stringham was a young man twenty-eight years of age, a chauffeur for the Lloyd Coal Company. Goff was twenty-five years old and before coming to Chicago had lived in Indiana, where he worked on a farm. He came to Chicago the day after Thanksgiving in 1925 and was employed by Ignatius Volushack, driving a truck. He was a cousin of Stringham, and he went to live at the house of Mrs. Martin, where Stringham lived.

The killing of Nusbaum was the result of a conspiracy among these five persons. On December 16 Mrs. Nusbaum came to Mrs. Martin's house with $13, which she wanted to send to Winn at his room, No. 863 East Sixty-third street. She told Mrs. Martin that there was trouble; that Nusbaum wanted to go out and get Winn that day, and that she had called Winn up and told him to get out of town, and he said he didn't have any money to go with but was sick and could not work. She asked Mrs. Martin to take the money and have it sent to Winn, and she wanted $5 more from Mrs. Martin. Mrs. Martin did not

have it but she got $3 more, and gave the money ($16) to Stringham and he and Goff went to Winn's room with the money. This was Goff's first meeting with Winn. About seven o'clock that evening Winn came to Mrs. Martin's house. He was pretty drunk then and in a short time became wholly drunk, as they sat down and continued drinking. Stringham testified that Winn wanted to go out and get Nusbaum that night, saying, "I am going to get the old man," but Mrs. Martin, Goff and Stringham, partly by force and partly by persuasion, prevented his going and finally succeeded in getting him to bed. Stringham went to his work the next morning and returned about 5:30 in the afternoon. Goff and Winn were then planning to hold up Nusbaum. Mrs. Nusbaum was in the habit of visiting her son in the evenings, always going by the same route, and Nusbaum was accustomed to follow her. The plan proposed was that Goff should meet him where he had to pass between the lumber yard and the prairie, beat him severely enough to kill him and take what money he had. Winn told Goff that Nusbaum was in the habit of carrying from $1400 to $3000 on his person and Goff was to have this money. Goff was not acquainted with the streets and the location of the house and had no shells for his pistol, a .25 automatic which he owned, and it was agreed that Mrs. Martin would show Goff the route which Nusbaum would take and show him the store in which he could buy the shells and give him the money to buy them, and she was also to tell Mrs. Nusbaum of the plan. The next day Mrs. Martin did go with Goff and show him the surroundings and the store where the shells were to be bought, gave him the money and told Mrs. Nusbaum of the plan to be carried out that night. This was on Friday. Winn had gone to Crown Point. Mrs. Nusbaum said for them not to have it done that night because she had everything fixed up for the holidays. To please her the affair was postponed, and the next day Mrs. Nusbaum wrote to Winn,

as she had agreed to do, explaining to him that Nusbaum had not been held up because he did not go out that night. The next Saturday, which was the day after Christmas, Mrs. Nusbaum wrote and mailed a letter to Winn at Crown Point, which he received and attempted to destroy when he was arrested but was prevented. The letter is as follows:

*"My Dear Boy*—I just got that, you know, and I don't know how to get any money. But will try to get twenty-five on my ring and send it as soon as I can. But I don't want to be in the house when it happens. You dress as a woman and tell him you want to see me and I will be over to the kid's and play holdup. When you get him ramsack the house in the drawers, throw everything up and down, and I will send that money as soon as I get it. I hate to do it. It is either you or. me or him. He is pretty good now and let it be a holdup and a robbery. I sooner that you have somebody with you, some of the boys. Now I will tell you in the next letter Monday or Tuesday. I do. Sis is here with me now. So she knows all. Oh, I wish that gang would do it. I hate to have you do it. I will get the money on the ring and the watch if I can get it. I do, do you? Love, mamma to my baby. (And three crosses.)"

On Sunday night, December 27, Winn came to Mrs. Martin's and spent the rest of the night there. On Monday he asked Mrs. Martin to tell Mrs. Nusbaum that he was there and wanted her to come there and see him. Mrs. Nusbaum said she was afraid to come, but Mrs. Martin told her that Winn said she should come, and if the old man followed her, all right; let him follow. Mrs. Nusbaum then went home with Mrs. Martin. Winn hugged and kissed her and said, "My God, mamma! How you fell away!" He helped her take off her hat and coat. She wrung her hands as if they were cold. He sat down and took her on his lap and they hugged and kissed one another. He said, "Well, mamma, something has got to be done; you know, mamma, you would be free years ago if you would listen to me and let me have the boys do it." She said: "Well, I don't want you to do it; I don't want

you to kill the old man, because I could never love you the way I do if you killed him; let the gang do it." They went into the kitchen bed-room, where they remained ten or fifteen minutes, and after coming out sat and talked awhile, and Mrs. Nusbaum left between 4:00 and 4:30 o'clock. Winn said to Mrs. Martin, "I know mamma wants the old man killed in her heart but she don't want me to do it, and the boys are sore; they will not do it because I have planned it so many times, and I will do it myself; it would not bother me to do that any more than it would to hit the stove." Winn stayed at Mrs. Martin's that night. On Tuesday at dinner were Winn, Stringham, Goff and Mrs. Martin. After dinner, Pfister, Stringham's helper on the truck, came in and he and Stringham went back to work. Afterward Winn told Mrs. Martin to go up-town. She went about one o'clock, leaving Winn and Goff in the house. Goff testified that after she left, Winn said he was going to get the old man. He told Goff if he didn't do just exactly what Winn said, or if Goff tried to notify the police or anything, he would be killed in the attempt. He then sent Goff over to Nusbaum's to tell Nusbaum that the toilet was out of fix and the water flowing on the floor. Goff carried the message and came back with Nusbaum's reply that he would be over there as soon as he got his coat on. Winn said, "You go over and sit down by the machine and watch," meaning the sewing machine between the two windows in the front of the house. Goff sat watching, with Winn back of him watching Goff. When Goff saw Nusbaum coming Winn asked if he was alone, and being told that he was, said, "As the old man comes up the steps you go out and hold the dog." The dog was just outside the kitchen door in a corner, and as Goff heard Nusbaum coming up the steps he went out of the kitchen door into the hallway, turned around, took the dog in his arms and stepped away from the door so that the dog could not bite Nusbaum. The old man walked into

the kitchen door, and as he stepped past so that Goff could not see him Goff heard a stroke, then something falling on the floor and the door slammed shut.  Goff went back into the kitchen and saw Nusbaum lying on the floor on his back, looking toward the ceiling, with his eyes partly shut.

There is no necessity of going into the details of the acts which followed.  It is sufficient to say that Nusbaum's skull was crushed by several blows with a machinist's hammer, that his body was carried up to the attic and wrapped in blankets, and efforts were made to remove the stains of blood.  After these things were done Winn told Goff to go over and tell Mrs. Nusbaum the job was done; not to tell her who did it or how; just tell her that the old man was gone and she was free, and to bring the car back.  When Goff got to the house Mrs. Nusbaum was not there, but he found Mrs. Martin at the Pennsylvania station and she went to the neighbors to find where Mrs. Nusbaum was. Mrs. Nusbaum opened the door at one of the neighbors and came over to the house, and Goff told her that the old man was out of the way and she was free.  Winn had given him the keys to the garage, and Goff asked her if she had any money.  She said no; she had no money.  Goff said they had to have the car, and she told him to take it. He took the car and went back to Mrs. Martin's house. Mrs. Martin came home about 4:30, and Winn wrote a note and handed it to Goff, telling him what was in the note did not concern him; to take it over to Mrs. Nusbaum and take the car back.  He took the car back and put it in the garage and gave Mrs. Nusbaum the note.  After reading the note she said she did not have any money and gave him the bill of sale for the car.  After Stringham came back Winn told him to take Mrs. Martin to Crown Point.  Stringham said he had no money and had no car.  Winn told him to get some money from his boss, and when Stringham went away Winn sent Goff back to the Nusbaum place to get the car.  He brought it back, and

when Stringham came back he took Mrs. Martin and the little girl to Crown Point in the car about seven o'clock, while Goff stayed with Winn. Stringham returned at eleven o'clock, alone. Winn then said they would have to get rid of the body and told Stringham to back the car up close to the steps. The body was brought down from the attic, placed in the car and Winn told Stringham where to drive. They went past the junk-yard, took the body out of the car without the blankets and left it lying on the side of the street. They drove into the country, took out the blankets, carried them over into the brush and set them afire.

Winn made a statement to the police on January 1 and another on January 3, and both were introduced in evidence by agreement. In his first statement he said that at Mrs. Martin's house on December 16, 1925, Goff said he would stick the old man up if he had to do it in the house, and he was the kid that could do it. He said he would do it for the sake of mother Nusbaum and Sis (meaning Mrs. Martin.) Winn further said that on Sunday night before December 29 he came to Mrs. Martin's with a man named John Alley. The next day Mrs. Nusbaum came over and was crying. He went with her into Mrs. Martin's bed-room and remained there for fifteen or twenty minutes and Mrs. Nusbaum gave him forty cents for razor blades. Then she commenced to cry, and said that Goff told her and Mrs. Martin that Goff was going to stick the old man up and give him a good beating, and was going to do that for her and Mrs. Martin because he loved Mrs. Martin and was going to marry her. Stringham told Goff he would show him the way the old man followed mother Nusbaum over to the kids, and if Goff could not do it Stringham would help him. In his second statement Winn said he was going to tell the whole story about the killing of Nusbaum; that nothing was ever said about killing Nusbaum; that it was only going to be a hold-up and a

beating, in order that he would be better to Mrs. Nusbaum. The suggestion was made three or four weeks before, in the presence of Mrs. Martin, Goff, Mrs. Nusbaum and Winn. The plan was that Mrs. Nusbaum was to leave her house about 7:30 at night and go over to her grandchildren's house; that Sis Martin and Stringham were to show Goff the way over there. They knew the old man followed her over. This was to happen on Monday night, December 14, but did not because Mrs. Nusbaum told Goff that the old man was a little better; not to do it. Mrs. Nusbaum and Mrs. Martin wrote Winn two or three days later that Goff was sick and could not do it then, and Mrs. Nusbaum said for God's sake for Winn not to come in; that she didn't want him to be there when it was done. Winn answered the letter, and in his answer said it was understood that if Goff didn't get the old man between the tracks he was to go to the house dressed as a woman and hold the old man up there. It was all understood that way among the five. Goff was to go to Nusbaum's to hold the old man up and beat him up, tie Mrs. Nusbaum and ransack the house, to make it look as though it was a hold-up. This was to take place on the Monday night before Christmas, but didn't happen then because Mrs. Nusbaum met Mrs. Martin and told her to tell Goff not to do it. Winn came in from Crown Point Sunday night, December 27, to Mrs. Martin's house, where he stayed that night. Monday afternoon Mrs. Martin went out and came back with Mrs. Nusbaum, who was wringing her hands with cold. Winn kissed her and she sat beside the stove a few minutes and then the two went into the bed-room, where they remained about ten or fifteen minutes. They put their arms around one another's neck, and Winn said, "Don't worry; Goff will beat the old man up to-night." Mrs. Nusbaum then said, "My goodness, child, I want you to be out of town, because you know you will be the first one arrested for it." Then Winn told Mrs. Nusbaum that she was mix-

ing with the wrong kind of people; that they were going
to cause her a lot of trouble if she did not listen to what
he said; that if the old man was not treating her right,
as she told him, she should call the police and they would
take care of him and protect her. She said she could not
stand it any longer; that she didn't know what to do, and
he told her to cheer up, and Mrs. Martin told her not to
cry that way; that Goff would fix everything that night
for her. Then Mrs. Nusbaum said that that would not
do; that it was too cold for Winn to go back home that
night, and Goff said, "All right, Mrs. Nusbaum; we will
fix this later, then." After Mrs. Nusbaum left, Mrs. Mar-
tin said to Goff that he must do that for Mrs. Nusbaum
just as quick as they could get Winn back home. The
next morning, the 29th, Mrs. Martin, Goff and Winn had
breakfast together, and after breakfast Mrs. Martin said
she would see that Winn got home that afternoon and
after he went Goff would get the old man that night. Then
they changed their minds, and after dinner Mrs. Martin
asked Winn what he thought about this: that she would
take Goff over to Mrs. Nusbaum's and let him go down
to the house first and tell Nusbaum to come over,—that
there was someone waiting here to rent the garage,—and
catch the old man on the way over. This was about 2:30
on Tuesday afternoon, December 29. They left the house
and Goff came back with the car about three o'clock. He
tooted the horn and drove around back of the house, and
Winn saw Goff half way up the steps with somebody on
his shoulder. Winn opened the door and Goff said, "Look
out, Jack; I've got him." He had something all tied
around the man which looked like a red bed-quilt. Winn
said, "Goff, I don't want to see him," and ran into the
front room, and Goff came running in and said, "My God,
Jack! I have knocked his brains out; they are all over
the floor; what will I do?" Winn said it was all up to
Goff; that he was to do it and now he should brace up

and finish it up. He heard Goff in the next room, and then Goff knocked on the door of the room where Winn was and Winn opened the door. Goff said he had everything cleared up and wanted to know what he would do with him. Winn told Goff that was up to him; to go ahead with his work. A few minutes later he came back to the door and said he carried the old man up in the attic. He said he would have to go back and see Mrs. Martin and Mrs. Nusbaum. He went out, and when he came back Stringham had stopped his truck and was talking to Winn, and said to him, "Where did you get the old man's car?" and Winn said Goff would be there in a few minutes and tell him all about it. Stringham then asked Goff, and Goff could hardly answer, but Winn said, "Just tell how it was to your cousin," and then Goff told Stringham just how he did it. He said that he and Delila went over to Mrs. Nusbaum's, and that Delila went ahead of him and told Nusbaum that there was somebody over at the house to rent the garage. Goff was across the street when Nusbaum went out. Delila came out and Mrs. Martin gave Goff the keys to the garage. He got the car and caught Nusbaum just before he came under the tracks down by the Illinois Central depot and drove up and said, "Mr. Nusbaum, I got your car." Nusbaum got in with him. Goff had a hammer in his pocket, and drawing under the viaduct he took the hammer out of his pocket. Nusbaum was looking out the window, and Goff hit him on the head and he fell back between the seats and began to groan. Goff said he was scared to death. He stopped the car, reached back and hit him twice more over the head and then he drove to the house, opened the door of the car, picked him up, threw him across his shoulder and carried him up the steps. Stringham said, "I'll deliver this load and be right back; then we will take the old man and throw him on the railroad track." Stringham came home for supper and Mrs. Martin had supper ready. Winn had to have a sec-

ond quart of wine. While they were all sitting at the supper table deciding where they would go, Stringham said that he would tell them what to do. He would go and borrow $10 from the boss, then he and Mrs. Martin and Goff and the baby would take Winn home, then they would come back to Hammond and get a furnished room for a week, and that was what was decided on at the supper table. Mrs. Martin asked if Winn wanted some more wine, and he said he did. Goff went next door and got a milk bottle full of wine and sat there at the table drinking the last quart of wine. "And that's all I remember; that was about seven o'clock Tuesday night, December 29, 1925, until I woke up in the hotel at Crown Point."

The verdict was justified by the evidence. No other verdict could reasonably have been returned than one finding both defendants on trial guilty of murder.

When Winn was arrested in his bed-room in the hotel at Crown Point he attempted to destroy the letter which Mrs. Nusbaum had written to him on December 26 and tore it in two, but the fragments were taken from him by the deputy sheriff and the letter was introduced in evidence over his objection. Goff's automatic pistol was found at the same time under his pillow and was also introduced in evidence over objection. It is contended that this was erroneous; that the seizure of the letter and the pistol was a violation of Winn's constitutional right to be secure in his person, house, papers and effects against unreasonable searches and seizures. The plaintiff in error made no motion to have the letter and the pistol returned to him before the trial. It was only when the People offered them in evidence that it was suggested that the seizure of them by the officers of the State of Indiana on Winn's arrest in that State was unlawful and a violation of his constitutional rights. Where it is claimed that evidence against one accused of crime has been obtained by means of an unlawful search of his house or person and seizure of his papers and

effects, the question of such unlawful search and seizure must in general be presented to the court before the trial, if possible. The court will not stop a trial in the midst of the taking of evidence to determine whether the manner of securing competent evidence was legal or not. An offer of evidence on the trial of a cause raises only the question of its competency. A witness may have obtained information of facts to which he testifies by most dishonorable conduct, or possession of documents or articles which he produces by disgraceful or even criminal acts, but the court will not reject this evidence or refuse to receive the documents or articles thus obtained if they are competent to maintain the issue, or stop the orderly progress of the trial even to investigate the question whether the method of obtaining possession of the offered evidence was in violation of the constitutional rights of the person against whom it is offered. If the accused has not raised that question before the trial he cannot avail himself of it when the evidence is offered on the trial. (*People* v. *Castree,* 311 Ill. 392; *People* v. *Brocamp,* 307 id. 448.) The letter was properly admitted in evidence. The automatic pistol was not used in connection with the crime, but there is testimony that it was in the possession of Winn when he was threatening Goff at the time Goff testified that Winn was ordering him to go to Nusbaum's and bring him over to repair the toilet, and its admission, whether competent or not, did no harm.

Dr. Harold S. Hulbert, who qualified as an expert in mental and nervous diseases, testified that he examined Winn on February 20, 1926; that he was a slight, frail man about fifty years old, pot-bellied, with curved spine, tilted hip, protruding piles, varicose veins, hardening of the arteries, the muscles of his left side and limbs wasted compared with the right, and that he stood with his knees bent. His muscular strength was weak compared with a normal person. The grasp of his right hand by dynamome-

ter tests was 20 and his left hand 9, while the grasp of
the doctor's left hand was 45 and his right hand 40. This
test was somewhat under the control of the subject. A
boy ten years old would possibly record 10 or 15 by a
dynamometer test. Dr. Hulbert was then asked a hypo-
thetical question, based on the evidence as to Winn's con-
dition and as to Nusbaum's size, age and condition, whether
or not Winn could have inflicted the blows causing the in-
juries shown by the evidence. It is contended that the
court erred in sustaining an objection to the question. The
question was not one for an expert opinion. After hear-
ing the testimony of Dr. Hulbert as to Winn's physical
condition in February, and the testimony of Winn himself
and the other witnesses as to his activities preceding and
at the time of the murder, the jurors were acquainted with
all the facts and were competent to form an opinion as to
Winn's ability to strike the fatal blows. The question was
not one requiring peculiar skill and knowledge but was
within the range of ordinary intelligence and observation,
and in such case opinion evidence is not admissible. *Yar-
ber* v. *Chicago and Alton Railway Co.* 235 Ill. 589.

The fourth assignment of error is that the court erred
in giving instructions for the State and for the defendant
Eliza Nusbaum and in refusing proper instructions in be-
half of the plaintiff in error. It is not argued that any
instruction given for the People was erroneous or that any
instruction offered by the defendants was erroneously re-
fused, nor is the giving of any particular instruction for
Eliza Nusbaum attacked as erroneous. In fact, the bill of
exceptions shows that all the instructions given for the de-
fendants were given at the request of both defendants, and
it is not argued that any of them is wrong. The two de-
fendants who were on trial were represented by different
counsel, who separately cross-examined the witnesses for
the prosecution and separately introduced witnesses in be-
half of their respective clients. Mrs. Nusbaum testified;

Winn did not.   Mrs. Nusbaum introduced witnesses to
her good character; Winn did not.   Naturally the differ-
ent course of their defenses required different instructions.
Thirty-nine instructions were given at the joint request of
the defendants.   In twenty-one of these instructions Mrs.
Nusbaum was mentioned by name while Winn was men-
tioned by name in six, only, and in four of them Mrs.
Nusbaum was also mentioned by name.   Instructions were
given in regard to evidence of good character, the right
of defendants to testify, the manner of treatment of their
testimony, the rule that no presumption against a defend-
ant should be indulged because he did not testify, and in
these particulars the rules applicable to the two defendants
were not the same.   Other instructions were given in which
Mrs. Nusbaum was mentioned by name which might very
well have included Winn's name or omitted any names.   If
any of them was of such a character as would lead the
jury to believe that the rule announced applied to Mrs.
Nusbaum alone and did not apply equally to Winn, coun-
sel for the plaintiff in error has not referred to that in-
struction in his brief.   The bill of exceptions, which is
the plaintiff in error's pleading, shows that the defendants
asked these instructions.   There is nothing to show that
the plaintiff in error did not know what they were before
they were given or was not satisfied with them.   His coun-
sel had the opportunity to ask for any instructions which
he thought necessary for the presentation of his defense to
the jury.   His argument is not based on the incorrectness
of any principle announced in any instruction or the ap-
plication of any rule of law to the evidence in the case.   It
is, that it was the duty of the judge to see that neither de-
fendant was given undue prominence and that the instruc-
tions were fair to both; that the mention of Mrs. Nus-
baum's name alone so many times and of Winn's name
alone so few times would lead the jury to believe much
could be said for her but little for him, and that instead

of being fair to both, the instructions, as a whole, were unfair to Winn. Counsel state the well understood rule that instructions to juries should not give undue prominence to any particular witness or any particular part of the testimony by calling him or it specially to the jury's attention, and the inference seems to be drawn that since Mrs. Nusbaum was a witness in her own behalf and Winn was not, the repeated reference to Mrs. Nusbaum and the ignoring of Winn in the instructions indirectly but powerfully called the attention of the jury to the fact that Winn did not testify. The two were on trial together charged with a murder, the result of a conspiracy to which both were parties. The jury saw Mrs. Nusbaum and heard her testify on direct and cross-examination. They knew Winn did not testify. They heard his unsworn statement made to the police but did not have the benefit to be derived from a cross-examination. Nothing the court could say could more forcibly impress upon the jury the fact that Winn had the opportunity to testify on his trial in his own behalf under oath and subject to cross-examination and chose not to do so. The court did instruct the jury at the request of the defendants that while a defendant in a criminal case was a competent witness to testify in his own behalf he was not compelled to do so and his neglect to testify should not create any presumption against him. He was entitled to no more than this.

The judgment of the criminal court is affirmed, and the fifteenth day of April, 1927, is fixed as the time when the original sentence of death shall be executed.

*Judgment affirmed.*