(No. 19749.—

The People of the State of Illinois, Defendant in Error, vs. Rudolph Anderson, Plaintiff in Error.

*Opinion filed December 20, 1929.*

Michael A. Romano, and Louis N. Blumenthal, (Clyde C. Fisher, of counsel,) for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, and JAMES B. SEARCY, (HENRY T. CHACE, JR., and EDWARD E. WILSON, of counsel,) for the People.

Mr. JUSTICE HEARD delivered the opinion of the court:

Plaintiff in error, Rudolph Anderson, was indicted in the criminal court of Cook county on December 1, 1926, by a grand jury of Cook county, for the murder of Albert Gersch. The indictment charged murder by stabbing with a knife. Plaintiff in error pleaded not guilty to the indictment, and the cause was continued from time to time to June 27, 1928, when it was stricken off the calendar with leave to re-instate. On July 13, 1927, plaintiff in error was admitted to bail in the amount of $12,000. At the time the cause was stricken from the docket the sureties on plaintiff in error's recognizance were discharged and he was at liberty without bail until August 30, 1928, when the cause was re-instated, a *capias* issued, and he was arrested at the home of his sister, where he had lived after his release on bail. On December 10, 1928, his trial began, and on December 14 the jury found him guilty of murder and fixed his punishment at imprisonment in the penitentiary for the term of twenty-five years. Motions for a new trial and in arrest of judgment were heard and overruled and plaintiff in error was sentenced in accordance with the verdict of the jury. To review this record he has sued out a writ of error from this court.

Girard street and Wood street, in the city of Chicago, are parallel north and south streets, Wood street being the next street east of Girard street. The 1600 blocks of these streets are separated by a north and south alley and also by an east and west alley running from Wood street to Girard street. This block lies between North avenue on the south and Wabansia avenue on the north. Plaintiff in error, together with William Fenske, lived at 1625 Gir-

ard street, his apartment being on the rear end of the lot, the part of the lot facing on Girard street being vacant. Mrs. Siatkowski lived at 1627 Girard street, immediately north of plaintiff in error, the two homes having a connecting bath-room. A family named Stkrsite lived at 1628 Wood street on the rear of the lot, next to the alley. All of these homes faced and had entrances on the alley. About 11:30 P. M. on Sunday, November 14, 1926, Albert Gersch was found in an alley in the rear of 1627 Girard street mortally wounded, was taken to a hospital and died soon thereafter. There were three knife wounds in the body, an incised wound on the left eyebrow, one in the left groin and a similar wound in the left thigh. No gunshot wounds were found upon the body. About two o'clock the next morning, in the rear of 1628 North Wood street, a police officer found the blade of a butcher knife about eight or ten inches long, with a fresh break at the end of the blade. The blade was minus a handle. The next morning a police officer found six empty 25-caliber shells scattered, a few feet apart, in the rear of 1625 Girard street. No witness identified plaintiff in error as the person who inflicted these wounds and no witness testified to having seen him in possession of the knife blade, with which the wounds upon the person of deceased were evidently inflicted. Plaintiff in error's conviction was based upon circumstantial evidence.

On Sunday morning Edward Hanke, Fenske and plaintiff in error had breakfast at a restaurant. Plaintiff in error and Hanke then went to the home of one Jankiewicz, called "Mowie," and found deceased, Gersch, there. All of them drank fig wine, and at about 11:30 A. M., Mowie and plaintiff in error went to the home of one Burke, at 1720 Brigham street. At about 1:00 P. M. deceased came to Burke's flat, and about 3:00 P. M. Hanke and Edward Becker came there, both intoxicated, according to the testimony of Burke. An argument ensued between Burke,

Hanke and Becker with reference to a warrant which Burke had sworn out for Hanke's arrest for stealing Burke's money. Deceased sided with Becker and Hanke, while Mowie and plaintiff in error sided with Burke. Burke testified that during the argument he saw deceased had a small automatic in the palm of his hand. Burke ordered Hanke and Becker out of his flat and they left. Deceased left shortly thereafter. According to Burke's testimony, while they were there there were knives, forks and plates on the table. After they left, a bread knife answering the description of the one found in the alley by the police officer was missing. At about 4:00 P. M. all the persons who were at Burke's, with the exception of Burke, met in the rear of a candy store at 1429 Wood street, where they stayed about an hour, drinking about two pints of alcohol. At about 6:00 P. M. Hanke left the group, and plaintiff in error, Mowie, Becker and deceased went to plaintiff in error's flat, where they ate dinner. After they had finished eating, Hanke came in. Plaintiff in error cleared the table and washed the dishes while the other four played cards at the kitchen table. Later Mowie's father, one Johnson and one Bolder came in and took part in the card game. They played for the drinks, the two losers being required to go out and purchase moonshine. During the course of the evening, between 7:00 and 10:30 P. M., the evidence shows they drank eight or nine pints of moonshine. During the card game deceased and Mowie engaged in an argument about religion, deceased insisting that there was no God and Mowie resenting this statement. They almost came to blows, but were separated by plaintiff in error and Mowie's father. Fenske came in at about a quarter to ten, read the paper and went to bed. Mowie, his father and Johnson went home, Mowie being so intoxicated that he could not stand on his feet and it was necessary to carry him out and put him in his car. Bolder left about a half hour later. Although all of the

witnesses who were at plaintiff in error's flat on that Sunday evening were very drunk there is little discrepancy in their testimony up to this point. As to what occurred after this time there is such a variance between the testimony of all the witnesses that it is necessary to recite the testimony of each witness more in detail.

Edward Hanke testified that after the others left, Becker, plaintiff in error, deceased, Fenske and himself remained in the flat, Fenske being in bed; that witness went into the washroom and remained there about five or ten minutes; that he heard nothing said between plaintiff in error and deceased; that when he came out of the washroom Becker was the only one left in the apartment; that plaintiff in error came running in with bloody hands and bloody shirt, going toward his bed-room, saying, "Where is my gun?" that he had on blue pants and white shirt, all dirty; that when plaintiff in error came in the doorway he made a pass at Becker; that Becker asked him what was the matter, but plaintiff in error did not reply; that witness told Becker to come out; that while they had entered the apartment from the alley they went out of the other door, went to Girard street, then to Milwaukee avenue and from there to Wood street; that at Wood and Division streets they borrowed car fare to go on the "L"; that witness did not hear any shots fired or any loud talking in the alley; that on Tuesday, November 16, he made a statement in writing to Sergeant Balata; that he was asked this question by Balata, "How long were you fellows in Rudy Anderson's flat?" and that he made this answer: "Well, Mowie, Jankiewicz, his step-father and Johnson went home about 10:00 P. M. and about 10:30 Becker and I went home;" that he was asked this question, "Did Rudolph Anderson leave the flat at any time while you were there?" and that he answered, "No;" that he was asked, "Did you see a 25-caliber magazine pistol in the hands of Rudolph Anderson in his flat at any time?"

and that he answered, "No, I did not;" that he does not remember saying anything to Balata about Anderson coming in looking for his gun; that he was sworn at the coroner's inquest on Wednesday morning, November 17, and he did not remember what he answered the coroner. When asked why he did not tell the truth in his statement to Balata, he said that he was drunk at the time he made it. The officers testified that he was not then drunk.

Becker testified that after the others left the flat, he, deceased and Hanke were in the kitchen, drinking, singing and fooling around with a ukelele; that Fenske was in the bed-room; that plaintiff in error wanted deceased to do the Charleston, and deceased said he would not; that they grabbed each other underneath the arms and walked out of the door; that it was then about a quarter after 10:00 or 10:30 P. M.; that in five or six minutes plaintiff in error came back but deceased did not; that plaintiff in error's shirt was splashed with blood and torn and his hands were covered with blood; that when he came back in the flat witness asked him what the trouble was, and plaintiff in error made a swing at witness, just tipping his nose, and said he was a hell of a friend, and said, "Where is my gun? Where is my gun?" that plaintiff in error went into the room where Fenske was sleeping and fooled around his trunk; that Hanke then came out of the washroom and said, "Let's get out of here;" that witness had his hat on but did not have his coat; that he went into the room where plaintiff in error was and got his coat; that Fenske was just getting up and holding plaintiff in error by the arm by the side of the bed; that plaintiff in error's arms were hanging down his side and witness saw something in his hand that looked like an automatic pistol; that he did not hear anything at all that was going on in the alley; that he heard no shooting in the alley at any time that evening; that while they came in by the rear door they went out the front way; that he did not know

whether plaintiff in error went back into the alley. Witness denied being at Burke's house that afternoon, while all the other witnesses testified that he was there. On November 15, at the Racine avenue police station, Becker made a statement in writing to officer Payne, which he identified as defendant's exhibit 2 for identification. On being asked categorically as to each one of the questions and answers in the statement, Becker testified that he did not remember whether he made them or not, but said that the statement which at the coroner's inquest he testified was true was not true.

Mrs. Siatkowski, a witness for the State, testified that on the night in question she lived at 1627 Girard street and went to bed after 10:00 o'clock; that about 11:00 o'clock she heard some knocks and plaintiff in error came through a connecting bath-room between her house and the house next door; that his hands were bleeding, and he said, "Where are they?" that she said, "Who;" that he then said, "Look what they done to me;" that she offered him a bandage, and he said he did not want a bandage on his hands then.

Ignatz Stkrsite, a witness for the State, testified that on November 14, 1926, he lived at 1628 North Wood street; that about 11:10 or 11:15 P. M. he heard four or five shots in the alley; that he went to the window on the alley side; that he saw one man lying down and another man jumping at him, kicking him in the face; that witness said, "Let go that man! Don't kill him!" that the man said, "Shut up; I kill it like a dog;" that he did not hear any talking in the alley; that he did not tell Sergeant Balata that he heard seven shots and what sounded like four or five men arguing in the alley; that he called the police, who came five or seven minutes later in automobiles.

Marie Gimble, a daughter of the last named witness, who on the night in question lived with him at 1628 North Wood street, testified that on the night in question she

heard a few shots fired and after a few minutes saw two men walking north toward Wabansia avenue, coming from the south; that one of the men had on a gray cap and overcoat and the other had on a white shirt and dark trousers; that she heard one of the men say, "Why, you are a hell of a friend not to defend me; they cut me up and you go ahead and don't stick for me; I will get even with you;" that she heard the other fellow answer, "If I helped you I would have got the same thing you did;" that the man in the white shirt and dark trousers went to the cottage across from her home, came out with a knife and struck the man with the overcoat; that when that man fell the other man turned him over on his back and started jumping on his face; that she appeared as a witness at the coroner's inquest and that she did not testify there about throwing a red-hot poker at the man who was doing the kicking. From the witness stand the witness testified she heard three shots in rapid succession and then two more shots. She admitted, when asked the question by the police, that at the time she made her statement she stated that she heard two shots fired and about a minute after she heard four or five more in rapid succession. She admitted that in her statement to the police she said· she paid no attention to the shots because she thought someone was throwing cans in the alley, and that she lay on the davenport for about fifteen minutes, when she heard an argument in the alley. She testified that the only light that came into the alley was from a street light about half a block down, and that the glow of that street light was able to penetrate the darkness and rain and cast the reflection into the alley, and by means of that light, she testified, she was able to see the flash of steel. She admitted that at the coroner's inquest, in answer to the question, "How was the alley lighted?" she answered, "Well, it was not lighted, but whenever the wind would blow I could see shadows." When asked if she had testified at the coroner's inquest

that the instrument in the hand of the man who was doing the assaulting was a knife, she stated that she did not remember. She testified that the man in the white shirt and dark trousers struck the other man two blows, "one a downward blow on the back of his head, here by the right ear, and the other blow in the face—the right cheek—a swing downward."

Dr. Foley, the coroner's physician who made the postmortem examination, testified that there was a wound on the left corner of the left eye-brow, a stab wound in the left groin and a stab wound in the thigh of the left leg.

William Fenske, a witness for the State, testified that he lived with Anderson at 1625 North Girard street; that he arrived at the flat about 9:00 P. M., Sunday, November 14, 1926, read the paper awhile and went to bed about 9:30 P. M. in a room adjoining the kitchen, where the boys were playing cards and drinking; that he fell asleep but was awakened by the voices of Anderson and Gersch; that he thought they were joking; that he heard Anderson say to Gersch, "Dance the Charleston," and heard Gersch reply, "I don't feel good; I don't care to dance the Charleston for nobody;" that Anderson called Gersch a vile name and said, "I will make you dance the Charleston;" that they went out the rear; that he heard the voices of Anderson and Gersch in the alley; that in ten minutes Anderson came back but Gersch did not; that Anderson had a ring of keys and went wild, using threats to kill; that he came into the bed-room and put a key in the trunk; that he was intoxicated; that his shirt was torn, his hands were bleeding and he was cut through his fingers and the palm of the hand; that with a flourish he came out and waved a gun; that then witness got out of bed and got a hold of Anderson around the waist and tried to take the gun away from him but Anderson rushed out of the door; that then he heard shots in rapid fire which seemed to come from the alley. This witness, in describing the defendant's move-

ments after he returned, testified that he came from the kitchen into the bed-room and then out of the bed-room back into the alley; that after Anderson returned to the alley witness put on some clothes and ran around the corner to a friend's house to spend the rest of the night. Over objection of defense counsel he testified that on April 15, 1928, (one year and five months after the homicide,) he was forcibly abducted by the defendant and others and held in captivity, under the constant surveillance of armed guards, until the first of July, 1928, a period of some two and one-half months; that at 2:30 A. M. on April 15, 1928, four men, one of them the defendant, came to where he was living, 2060 West North avenue, ordered him out of bed and took him to the home of Frank Egan, 1248 North Robey street, where, with Egan and one Bolder as his captors, he was held four days. Witness also claims that from the Egan home he was taken to 6533 Ehrigree drive, in Niles, where for two weeks he was held captive, with George Bolder as his guard; that Anderson came to see him regularly; that from this place he was taken to a farm at Twenty-second and Harlem streets by Anderson and Joe Just, where he remained about a month working under the name of Billy Juhl, and from there he was taken to the farm of Joe Machusek, at Pulaski, Wisconsin, where he was also held an involuntary prisoner; that from there he was taken to the home of Anderson's sister, at 3256 Natchez avenue, and then to the summer resort of Frank Schumway, at South Haven, Michigan, by Frank Novak, Tom Bolder and Anderson, against his will; that he was released from captivity the latter part of June, when Anderson came to him in South Haven and said, "Well, it's all over now; the case is over; let's go back;" that witness returned to Chicago with Tom Bolder on June 30, 1928; that the first mention he made of his abduction and captivity was from the witness stand at the trial. He admitted that the reason he left the farm at Twenty-second

and Harlem was because he was discharged by the man for whom he was working.

Leonard Thurnell, a State witness, testified that he was a police officer and that he went to the premises at 1625 North Girard street about half-past twelve, found an automatic, a clip, twenty-five automatic Colt pistol shells and five unexploded shells smeared with blood, lying on the table in the kitchen. He went into the parlor and saw a trunk and took keys out of it that were covered with blood also. It was in an upright position, and the drawers were also covered with blood. There was no disorder as far as the furniture was concerned. There were finger-marks on the drawers—impressions of fingers with blood on them and bloody finger-marks on the keys. He found the trunk at a forty-five degree angle. The drawers were still in the trunk and out about three or four inches. He found one suit in the trunk, some shirts, ties and collars and found clothing in each drawer. There was some blood on the inside of the upper drawer. He took in a shirt and a collar. Another shirt was taken in, and it was in the kitchen, lying on a chair.

Patrick Madden, a police officer, who was called as a witness on behalf of the State, testified that "Sunday, November 14, 1926, I was a wagon man—had charge of the patrol wagon at the station at 731 North Racine avenue. Sunday night I was on duty and about 11:15 I went to the alley between Girard and Wood, between North avenue and Wabansia, and arrived there about 11:30. We had the wagon in the alley and we found a man in that alley, put him on a stretcher and rode to the County Hospital. We were gone again in about three minutes. When I got to the County Hospital he said his name was Harry Brown and that he lived at 200 West Erie street. The doctor said he was in bad shape. I said to him, 'You're in bad shape.' He said, 'Yes.' I said, 'You're in bad shape and your name may not be Harry Brown.' He said, 'No, my name is

Gersch.' I said, 'Give me your right address, too.' He said, 'I live at 1029 North Lincoln street.' I said, 'All right; who injured you?' He says, 'Just let me rest.' Then he turned over in his bed at the hospital and refused to talk any more. The doctor, nurse and I helped take his clothes off. I searched his clothes after he was undressed and I took a Colt 25-caliber pistol out of his pants pocket and it was bloody. He had bled a good deal, and the doctor said he was stabbed in the left temple, left groin and left hip. By flashlight I seen blood on him in the alley, and it was sloppy and muddy. That was all the conversation. To my best belief the gun was found in the left hip pocket. He was stabbed in the left side and had wounds. The clip was missing from the gun. The gun had blood on it."

Edward Balata, a police sergeant who had charge of the case, testified that he got a statement from plaintiff in error Monday afternoon, but it was not written down because the assistant State's attorney who was present thought plaintiff in error was too drunk to be questioned at that time; that plaintiff in error told him with reference to what took place after Becker, Hanke and deceased were left in the kitchen; that Anderson said he, Becker, Hanke and Gersch were playing cards and he fell asleep at the table; that he was awakened by some shots, which appeared to him as though they came from the alley; that he went out alone to see what the matter was and he was assaulted by four or five unknown men; that they punched him and when he went down they kicked him. He said as he came to his senses there was a fellow over him with a club about to strike him with the club, and that is how he got his fingers cut; that he then ran away in fear of his life. Plaintiff in error told witness he ran over to North avenue and Girard street, got into a Brown cab and drove out to his sister's house, at 3253 Natchez avenue, and arrived there around midnight; that he could not tell

whether these fellows who attacked him were white men or negroes and could not tell their size; that he said nothing was said by any of these fellows before or while they were attacking him in the alley and he did not see any armed with a gun; that he was so badly scared and frightened he did not think about going into the house and tell his pals of this attack; that he went out without a coat and cap and wore a white shirt and dark pants. Witness took a statement from Hanke; that Hanke told him, among other things, that about 10:30 P. M. Becker and he went home; that "when I and Becker left, there remained in Anderson's flat, Al Gersch, Mowie, Fenske and Rudolph Anderson." Balata further testified: "I asked Hanke this question: 'Did you see a 25-caliber magazine pistol in the hands of Rudolph Anderson or in his flat at any time?' and he answered, 'No, I did not.' Hanke also stated to me that Rudolph Anderson did not go out at any time while he (Hanke) was in his home. I heard Hanke testify at the coroner's inquest and I was present at 10:00 A. M. at the Cook county morgue before deputy coroner Peter C. Granada. I read the statement at the coroner's inquest when Hanke was present. Hanke was sworn as a witness after I read the statement. Then, after Hanke was sworn, the deputy coroner asked of Edward Hanke, 'Did you hear that statement read to you by Sergeant Balata?' and he answered, 'Yes.' He next asked Hanke, 'Is that statement correct and true and did you make it of your own free will?' and he answered, 'Yes.' Then he was asked, 'Is there anything else you would like to add to that statement, or detract?' and he answered, 'No.'" Balata also testified that he took a statement from Ignatz Stkrsite; that "I remember asking him this question: "Tell me in your own way just when and where you heard this shooting,' and he answered, 'On November 14, 1926, 11:15 P. M., I and my wife and family were sleeping in bed in my home, 1628 North Wood street. I was awakened by seven

shots being fired. I wasn't quite asleep—just lying in bed. Then I heard an argument in the alley in the rear of my house. It seemed to me as though three or four men were in this argument that lasted two or three minutes.' He was asked this question, 'The man you saw lying in the alley was stabbed. Did you see the man who did the kicking use a knife on him?' and answered, 'No, sir.' " Hanke did not tell Balata, either before the statement was transcribed or after the statement was written, anything about hearing the voices coming from a porch next door, but he did say that he heard the voices of three or four men in argument in the alley and that he heard seven shots fired and then the argument. After the coroner's inquest Balata informed Hanke and Becker that they were held as suspects on a murder charge. He took a second statement from them, as their first statement was not satisfactory to him. These latter statements were received as evidence over plaintiff in error's objection but later were stricken out by the court.

Officer Pilling, a witness for the defense, testified that on November 15, 1926, he took a statement from Becker which was written out by officer Payne and signed by Becker; that among other things Becker told them that "we played until about 10:20 P. M. and then I told the fellows I had to leave, as I had a date at 10:30 P. M. at Division and Paulina streets with a girl named Sophie Mikucki, 4142 West Potomac avenue. I then left with a fellow named Edward Hanke, who lives on Brigham street near Ashland avenue and who had come to the Anderson home about 7:30 or 8:00 P. M. Hanke walked as far as Division and Paulina streets, where I left him, stating I was going to take the 'L' train. I met my girl at the 'L' station, Paulina and Division street, took her home, staying with her until about 11:45 P. M., and then I got on a Division street car, rode west to California avenue, where I transferred north, rode to Bloomingdale avenue, where I

got off and walked home. Mowie, his father and Johnson left when I and Hanke left."

Plaintiff in error testified as follows: "I am twenty-five years of age, born in Chicago and single. I have been a chauffeur, clothing cutter's apprentice and clerk. I worked for the Central Transfer Company four months as chauffeur; also chauffeur for the Commonwealth Edison Company fifteen months. I worked as an apprentice cutter for the Kuppenheimer Clothing Company about eighteen months, worked as a clerk for Marshall Field for three years, worked as an assembler for the Felt & Tarrant Company, adding machines, for about two years. That represents the greater part of my working life. I graduated from the public school at fourteen years, when I went to work. I graduated from the Holy Trinity school, Division and Cleaver streets, when I finished the eighth grade. I knew Albert Gersch in his lifetime about fifteen years. My relations with him were always very friendly and I never had any trouble, quarrels or disputes with him. I remember Sunday, November 14, 1926. I lived at 1625 Girard street at that time about three months. After Mowie and his step-father and Johnson left, that left there Becker, Gersch, Hanke, George Bolder and myself. Becker and Hanke were partners. So were Gersch and Bolder. Bolder played several hands and left about a half hour after Mowie, and then I played cards. Then Gersch wanted to get another pint for an eye-opener in the morning. Previous to that he asked if he could stay at my home. His mother did not want him coming home drunk. He wasn't working. Becker and Hanke stayed at my home several times. They wanted to stay and I told them I did not want them, and they did not feel very well about it. I had a few more drinks and felt tired and slept. I went to the next table, put my head on the table and went to sleep. After I fell asleep the wind was blowing in and it woke me up. I got up and noticed both doors open. I closed the doors and I

heard some shots. The sound of these shots came from the alley, and when I got out to the alley I found Gersch, Becker and Hanke. Gersch was lying on the ground. Hanke was striking Gersch and Becker was kicking him. There was a knife in Hanke's hand. I struggled with Hanke and tried to stop him from using the knife on Gersch. Then Becker took a blow at me and he tore me away from Hanke and pushed me against the fence. I struggled with Hanke and attempted to get the knife and stop him. When I reached for the knife I got both hands cut. Then I ran into Mrs. Siatkowski's apartment and came up the stairs again. Then I came back into my home. I showed her my hands and said, 'See what they did to me.' She wanted to bandage my hands up and I went through the toilet room into my home. I don't remember what I told her when she wanted to bandage my hands. Then I took the keys off the hook and went into the trunk to get a shirt. The shirt I wore out in the alley was all torn. I took this shirt off, went into the trunk and got a heavy blue flannel shirt. Fenske, Becker and Hanke were not in the house at that time. No one was there when I went to my trunk. After I got this shirt I noticed a magazine clip on the table, in the center of the round table. I laid my hands on it. I noticed it was bullets and I put it back. My hands were paining me awful. I felt it was best to go to my sister's home and have them taken care of. I went out to the corner of North avenue and Girard and hailed a taxicab, which drove me out there. When I got to my sister's my brother-in-law bandaged my hand. Then I went to bed and remained there all night. I saw Fenske practically every day around Wood and Milwaukee avenue between April and May, 1928, this year. I have had conversations with William Fenske concerning Sergeant Balata. He said Sergeant Balata was always persecuting him and hounding him to go to court against me; that Balata told him he can have him indicted for murder; that he had a record, having been charged with murder

previously. He said he didn't have anything against me, just what Sergeant Balata told him to say. I heard Bill Fenske testify that I, in company with three or four other men, on April 15, at three o'clock in the morning, went to the room where he was staying, pulled him out of bed, forced him to get dressed and took him to Egan's home. I did not do this. I did not, in company with other men, take him to the Leslie farm and have somebody with him all the time to guard him. I did not have a guard for him at Pulaski, Wisconsin. I never went with William Fenske to South Haven in June or any other time. I did not on the 14th day of November, 1926, in the alley in the rear of 1625 Girard street, assault Albert Gersch with a knife. I did not strike him with a knife about the chest and thighs and by that means kill and murder him."

Becker and Hanke denied plaintiff in error's testimony as to their part in an assault upon deceased in the alley. Three witnesses testified that the general reputation of plaintiff in error as a peaceful, law-abiding citizen was good, and one witness, Sergeant Balata, testified that it was bad.

John Kanaby, a witness for defendant, testified that he did farmwork for the Leslie Company at Twenty-second and Harlem streets; that in April, 1928, he hired William Fenske, whom he knew as Billy Juhl, to plant grass. Fenske had told him he was sick; had just come from the hospital and would like to work on the outside for a couple of weeks. Witness testified that Fenske was employed by him for about five or six weeks and received three dollars and a half a day; that Joe Just, his step-son, came with Fenske to look for a job; that no one ever guarded Fenske and he was free to go and come as he pleased. Witness testified that at no time did Fenske tell him he was afraid to leave the place.

The affidavit of John Kanaby was offered, together with other affidavits, in support of the motion for a new trial. In his affidavit Kanaby adds to the testimony al-

ready referred to, the following: That in various conversations with Fenske while in affiant's employ, Fenske told affiant he was having trouble with his° wife; that he was doing that kind of work in the fields for his health; that during the five or six weeks of Fenske's employment he ate and slept at affiant's house, and at no time was he ever a prisoner or captive or under guard but that he did his work of his own free will; that affiant had occasion to notice the peculiar manner in which Fenske conducted himself and believes that there is something wrong with him. There was also offered in support of the motion for a new trial, and as newly discovered evidence, the affidavit of Mrs. Frank Egan, who stated that the only time Fenske came to her house was to collect a coal bill which she owed him; that he never stayed in affiant's home over night and was never held prisoner there. The affidavit of Mary Speck, of 6533 Ehrigree drive, in Niles, who stated that Fenske never slept at her house at any time nor was he ever held captive there. The affidavit of Sam Yaros, who stated that he knew Fenske for the past twenty years; that he met him in the streets of South Haven, Michigan, early in the summer of 1928; that Fenske told him he was there spending his vacation; that the affiant knew Rudolph Anderson and never saw him in the city of South Haven, and that Fenske at no time complained to him of being held a captive. The affidavit of Joseph Stanek, who is employed as a farmhand by John Kanaby, stated that he knew Fenske as William Juhl and met him about May 10, 1928; that Fenske was not held a prisoner or captive but came and went as he pleased.

The police officers on November 15, in the absence of plaintiff in error, without his consent and without a search warrant, searched his home and took therefrom wearing apparel and other articles that they found there, and they were allowed to testify as to the result of their search and the articles taken were offered in evidence by the prosecu-

tion as State's exhibits. The search of plaintiff in error's home and the seizure of the effects found there were in violation of his constitutional rights as defined in section 6 of article 2 of the constitution of 1870. (*People* v. *Stokes,* 334 Ill. 200; *People* v. *Castree,* 311 id. 392; *People* v. *Brocamp,* 307 id. 448.) Plaintiff in error did not make a motion for a suppression of this evidence before the commencement of the trial but waited until after the jury had been empaneled and the trial commenced. Where it is claimed that evidence against one accused of crime has been obtained by an unlawful search of his house and seizure of his effects, the question of such unlawful search and seizure must be presented to the court before the trial, if possible. If the accused has not raised that question before the trial he cannot avail himself of it when the evidence is offered on the trial. *People* v. *Winn,* 324 Ill. 428; *People* v. *Castree, supra; People* v. *Brocamp, supra.*

It is contended by plaintiff in error that even if he be guilty of killing Gersch, the evidence shows that he was intoxicated to such an extent as to render him incapable of forming an intent to do the act, and cites *People* v. *Cochran,* 313 Ill. 508, to the effect that in such case the killing is manslaughter and not murder. This case differs from the *Cochran case,* as in that case there was evidence tending to show that the intoxication was so extreme as to entirely suspend the power of reason and to render defendant incapable of forming any intent, while in the present case there is no such evidence, but, on the contrary, plaintiff in error himself testifies to his acts, thoughts and intentions at the time he is accused of killing deceased.

It is contended by plaintiff in error that the evidence does not prove him guilty beyond a reasonable doubt. On this question we express no opinion. We have not set forth herein the evidence on either side in its entirety, and while we have recited it at considerable length, we have done so for the purpose of demonstrating that the evidence of the

guilt of plaintiff in error of the crime charged was not of that clear and convincing character that the jury could not have reasonably found a verdict of not guilty. It was therefore highly important that the jury should be accurately instructed and that the record should be free from prejudicial error. *People* v. *Hamilton,* 336 Ill. 294; *People* v. *Schuele,* 326 id. 366.

On re-direct examination by the assistant State's attorney Edward Hanke testified that he went to his home about 4:00 P. M. on Monday, November 15, and talked to his sister. He was then asked by the assistant State's attorney, "What did she tell you?" to which counsel for plaintiff in error objected. After some colloquy between court and counsel the court asked the witness, "What was said by your sister?" In reply thereto Hanke answered, "My sister told me the policemen were there and looked over the clothing under the light to see if any blood-stains were on the clothing, and they did not find any. They had the clothing on the table." This evidence was objected to and counsel for plaintiff in error moved to strike it out, which the court did not do. This conversation was not in the presence of plaintiff in error, and neither the sister nor the policemen testified as to their examination of Hanke's clothing. It was one of the vital questions in the case as to whether or not Hanke inflicted the knife wounds on deceased, and the condition of his clothing as to blood-stains would have a material bearing on this question. The admission of this hearsay evidence as to its condition would naturally be prejudicial to plaintiff in error.

On the re-direct examination of Fenske by the assistant State's attorney he stated that he talked with Sergeant Stegeman. The following ensued:

Mr. Romano: "I object to conversation out of the presence of the defendant.

The court: "Overruled.

Mr. Romano: "Exception.

The witness: "I said, 'I want protection; I am being hounded; I want protection.' He says, 'All right, if there is any protection to be given I will give it to you.' He sent two police officers to Division, near Hoyne. I rented a horse (I had no money and was broke) for two dollars a day. The police came to my place and said, 'We can't ride around with you.' That's all they said to me. They did not stay long.

Q. "What caused you to go to Sergeant Stegeman, at this police station, April 14, 1928, at seven in the morning and ask for police protection?

Mr. Romano: "Objection.

The court: "Overruled.

Mr. Romano: "Exception.

A. "Well, an ice man in the neighborhood said, 'A machine is following you; they are looking for you.' He said, 'Is there any union trouble?' I said, 'My dues is paid; I got no trouble in the union.'

Mr. Romano: "I move to strike the answer and question.

The court: "Let it stand."

This conversation out of the presence of plaintiff in error was clearly incompetent and naturally tended to prejudice the jury against plaintiff in error.

The court, over the objection of plaintiff in error, admitted in evidence as exhibits the second written statements made by Becker and Hanke to Balata and concerning which he said, "The sum and circumstance of their testimony is about the same as in this statement." At a later stage of the trial the assistant State's attorney withdrew the exhibits. Thereupon plaintiff in error's counsel requested the court to orally instruct the jury to disregard the testimony of Sergeant Balata in so far as the same was based upon or referred to anything contained in these exhibits. The court denied this motion and permitted Balata's testimony referring to these statements to stand. These statements were not competent evidence against plain-

tiff in error, and the testimony of Balata just referred to, based thereon, should have been stricken from the record. The court erred in admitting the exhibits and in not striking out Balata's testimony as to their similarity to their testimony given on the trial.

The court admitted in evidence as an exhibit the statement which plaintiff in error gave to Balata. After the preliminary questions of name, address and occupation, the statement contained the following questions and answers:

Q. "Were you ever arrested before?

A. "Yes, several times.

Q. "I am showing you a police record of one Rudolph Anderson. Is that your police record?

A. "The first and last raps are right, the middle rap is wrong.

Q. "Did you serve time in the house of correction or Pontiac for any charge?

A. "No, sir."

This portion of the statement should not have been admitted in evidence, but plaintiff in error objected to the entire statement and did not point out this objectionable portion.

On the cross-examination of plaintiff in error's witnesses as to his good character the assistant State's attorney, over objection, was allowed to ask questions such as, "Do you know of your own knowledge whether or not the defendant, Rudolph Anderson, during the three years you knew him, was in any trouble of any kind with the police?" "You said you knew the defendant November 19, 1924. Do you know whether or not, of your own knowledge at that time, whether or not he was in trouble?" "Did you ever know whether the defendant, Rudolph Anderson, was in any police trouble prior to this?" He was also allowed to ask the witnesses whether they knew plaintiff in error on various other dates and if they knew whether he had any trouble at such times. The court's ruling with refer-

ence to these questions was erroneous. The reputation of a witness cannot be impeached by proof of particular acts. It must be by proving his general reputation for the particular crime with which he is charged, to be bad. On cross-examination or in rebuttal of proof of good character particular acts of misconduct may not be shown. (*People* v. *Celmars,* 332 Ill. 113; *Aiken* v. *People,* 183 id. 215.) The questions asked by the State's attorney on cross-examination had no justification. Their tendency was to prejudice the plaintiff in error in the minds of the jury. This court has often condemned the practice, in criminal cases, of asking improper questions for the purpose of creating in the minds of the jury a prejudice against the defendant, and judgments of conviction have been reversed for such conduct. *People* v. *Celmars, supra; People* v. *Rogers,* 324 Ill. 224; *People* v. *Black,* 317 id. 603; *People* v. *Lewis,* 313 id. 312; *People* v. *Green,* 292 id. 351.

Complaint is made as to the rulings of the court in the matter of giving and refusing instructions to the jury. While some of the People's instructions complained of are abstract propositions of law and one of plaintiff in error's instructions with reference to circumstantial evidence should have been given as the propositions laid down in it were not exactly covered by any other instruction, yet the instructions, when considered as a whole, gave the law of the case fairly to the jury, and we find no reversible error in this case in the court's ruling as to instructions.

From an examination of the entire record we are unable to say that it is free from prejudicial error and that plaintiff in error has had that fair and impartial trial to which under the law of this State he is entitled.

The judgment of the criminal court of Cook county is reversed and the cause remanded.

*Reversed and remanded.*