(No. 33483.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* MICHAEL MORETTI, Plaintiff in Error.

*Opinion filed September 23, 1955—Rehearing denied Nov. 21, 1955.*

ALLAN R. BLOCH, of Chicago, for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, (HAROLD A. SMITH, of Chicago, of counsel,) for the People.

Mr. JUSTICE DAILY delivered the opinion of the court:

Defendant, Michael Moretti, a Chicago police officer attached for duty with the office of the State's Attorney of Cook County, was convicted in the criminal court of said county of the murder of 15-year-old Arthur Gamino who, together with Edward Salvi, 21 years old, lost his life in a shooting that occurred during the early morning hours of August 24, 1951. The first grand jury to consider the charge against defendant returned a no bill; a second, however, endorsed and returned the indictment as a true bill. Defendant was then tried at the December 1951 term of court but the petit jury was discharged when it could not agree upon a verdict. A second trial on the charge was conducted at the January 1952 term at which time the jury found defendant guilty of murder and fixed his punishment at life imprisonment in the penitentiary. Following unsuccessful post-trial motions, judgment was entered on the verdict and the cause is now before us for review on writ of error.

The bizarre events which culminated in the death of Gamino and the judgment against defendant are centered around the loss and recovery by defendant of a .32 caliber gun. Inasmuch as many persons were involved and because the cause has been exhaustively presented and defended, the result has been a voluminous and extremely complex record, much of which must be detailed to meet the errors assigned here. Although we have read and examined the abstract minutely, we shall not summarize the testimony of each individual witness but will endeavor to set forth only the most salient facts and the points of evidence upon which there is major conflict. In approaching a summary of the evidence, it should be noted that it is the theory of the defense that Salvi, rather than defendant, fired the shot which killed Gamino, or, in the alternative, that if it was the defendant who fired the fatal shot, he did so

in self-defense. On such grounds it is urged that the verdict is against the manifest weight of the evidence. The People, for their part, assert that there is ample evidence of a deliberate murder to support the jury's verdict, and they advance the theory that the killing was motivated by revenge for a beating defendant received, and for the professional embarrassment he suffered over the loss of his gun.

Turning first to the testimony of the People's witnesses concerning the events which led to the loss of defendant's gun, the record discloses that on the night of August 23, 1951, about 10:30 P.M., defendant appeared in civilian clothes at a Chicago tavern known as Tito's Hacienda. He was accompanied by Eduardo Duran and Alphonse Toribio, with whom defendant admittedly had a slight acquaintance. After several drinks were served, (and defendant denies that he had any or that he is a drinking man,) defendant inquired about one of the owners of the tavern who was absent, and then left with his two companions. The three men returned to Tito's approximately one hour later, and present upon their return were Frank Navarro, one of the owners, Joseph Soria, the bartender, George and Simon Diaz, patrons, and several other patrons, both men and women. According to the persons named, defendant intruded upon several of those present and comported himself generally in a loud and aggressive manner until Navarro remonstrated with him over his use of obscene language in the presence of the women. Immediately after this occurred defendant made some inquiry of George Diaz relative to his status in the tavern, and terminated the conversation by striking Diaz with his fist. At this Simon Diaz jumped to his brother's assistance and struck defendant, who then either ran or was pushed out the front door. The Diaz brothers followed and there ensued a fight in the street during which defendant was pummeled until he became either dazed or unconscious and fell to the

pavement. Up to this point no person in the tavern except Duran, and possibly the bartender to whom defendant had exhibited a gun and a star in an unofficial manner, admitted any knowledge that defendant was a police officer.

Defendant's version of the events just related was materially different. He prefaced his testimony by stating that he was on furlough on August 23, that just prior thereto he had engaged in a conversation with his superior in the State's Attorney's office, and that he was in the area of Tito's on the night in question on official business as a result of such conversation. In the same vein, he stated that in the course of his police work he had been given the description of a man named "George" and that it was in connection with this information that he had gone to Tito's. Concerning the events of the evening in question defendant related that he had chanced upon Toribio and Duran in a tavern across the street from Tito's and that when he crossed over to the latter place, (and by his version he was in Tito's only on the one occasion that night,) Toribio followed him. When he arrived at Tito's he ordered coffee, stood at the bar looking around and, upon seeing Toribio enter, inquired of him if "George" was there. Defendant then heard someone shout: "George is my brother," and was immediately struck on the head from behind. He testified that in the seconds which followed he heard someone say: "It's that copper again;" that Toribio, reputedly a bouncer for the tavern, attacked him with fists and a bar stool; that he became unconscious and remembered nothing until later in the Maxwell Street police station at which time he discovered his money, his wallet, and a .32 caliber gun he had been carrying in his hip pocket, were missing.

The next persons to enter into the sequence of events were Maurice Castillo, later a witness for the People, and Edward Salvi, who was to become a victim of the shooting that occurred four hours later. These two young men were

in a lunchroom several doors from Tito's where they had been conversing with the owner, Louis Alejandre, who was also a witness for the prosecution. According to Castillo, he and Salvi saw a commotion in the street through a window and went out to see what was occurring. On reaching the scene they observed defendant sitting in the road, bloody and dazed, with a gun in his hand. Castillo took the gun from defendant, purportedly to keep anyone from getting hurt, and departed in his car together with a girl friend and Salvi. After driving a short distance on nearby Blue Island Avenue, Castillo stopped his car and threw the gun into one of the many vacant lots in the vicinity of Polk Street and Cabrini Street. He gave as one of his reasons for so doing that he did not want to meet any police officer with a gun in his car, and testified that at the time he did not notice in just which of the vacant lots in the area he threw the gun. Thereafter, Castillo and Salvi drove the girl to her home, stopped at a restaurant where they were met and joined by Leonard Monaco, who was later to survive the shooting, then proceeded to Castillo's home several miles from the scene of the fight.

Meanwhile, back at Tito's defendant recovered consciousness and, according to Navarro to whom Castillo had shown the gun, said he would be willing to forget the whole incident if his gun was returned. Defendant denied making such a statement. Shortly thereafter police officers, whom both Navarro and Alejandre claimed to have called, arrived at the scene and, at defendant's insistence, took Navarro to the Maxwell Street police station. There the defendant identified himself as a police officer, reported the loss of his gun and other personal effects, and told the officer assigned to investigate the case, that he "was making an investigation and some fellows jumped him and took his gun." Thereafter, defendant called his superior, chief investigator Gherscovich, informed him of what had occurred, and arranged for Navarro to be taken to the

State's Attorney's office. This was done about 1:00 A.M.
After questioning Navarro, who was kept in custody, defendant, Gherscovich and Edward Eisner, another investigator, returned to the Maxwell Street station. Defendant testified that during his questioning of Navarro, the latter told him that George was the man who assaulted him, that George was a dope peddler and was currently in possession of ten pounds of dope. Navarro, who stated that defendant struck him and threatened to get even, admitted that defendant had questioned him concerning a dope peddler but testified that he had denied any knowledge of such a person. A police officer who heard some of the conversation between the two stated that he heard defendant ask Navarro who had the gun, and that the latter gave a name the officer could not remember.

Upon defendant's return to the Maxwell Street police station it developed that the lost gun belonged to one of his two brothers, Salvatore or Vincent Moretti, who were Chicago Park District policemen and both of whom came to the station. One was wearing a gun belt and holster and had with him a .38 caliber revolver which the defendant took, saying he wanted to have it in case he had to go out with the Maxwell Street police to continue the investigation of the lost gun. It appears too that the police closed Tito's Hacienda, removed its license from the premises and stationed an officer there when it developed that the front door would not lock. In addition the bartender, Soria, was jailed and, when testifying, stated that he was arrested by Eisner and "one of the Morettis."

While the above events were occurring, word was apparently obtained in the vicinity of Tito's that Castillo had thrown the gun in one of the vacant lots on Blue Island Avenue, because search parties of 15 to 30 people, including residents of the neighborhood and police officers from the Maxwell Street station, were searching for it in the weeds in various vacant lots along the avenue. One person

so engaged was Peter Valtierra who had driven to the lots in the car of Louis Alejandre. He testified that Arthur Gamino, for whose death defendant was tried in this case, rode with him but he knew little of the boy's whereabouts after the time they arrived. Gamino, it appears, ran errands and sometimes worked in the Alejandre lunchroom. His father testified that he was 15 years old at the time of his death.

When the search for the gun first began, Toribio and Alejandre drove to the vicinity of Castillo's home and finding Castillo, Salvi and Monaco there, brought the first two named back to Blue Island Avenue to join in the search for the gun while Monaco remained in Castillo's car near the latter's home. Castillo took his dog with him and, by his version, when the dog became lost during the search, he persuaded Valtierra to drive him and Salvi back to the Castillo home so he could get his own car and conduct a search for the animal. Upon their arrival, Salvi got into the Castillo car with Monaco, while Castillo remained in the car driven by Valtierra. In his testimony, Castillo stated that he then directed the two to return to the lot to look for the gun. It should perhaps be interjected at this point that it is the theory of the defense that Castillo and Salvi were anxious to recover the gun in order to prevent it from falling into police hands with their finger-prints on it, but the testimony of Castillo and other fre-quenters of the area was that the purpose of the prolonged search was to find the gun and thus relieve Tito's tavern of some of the legal consequences of the affray there.

Salvi and Monaco followed the car containing Castillo and Valtierra but lost it in traffic. Salvi then drove to the vicinity of Tito's where Monaco made an inquiry for Cas-tillo. Upon being advised that Castillo was not there, Salvi drove to the Maxwell Street station where Monaco entered and had a conversation with the desk sergeant. Following this they drove to Tito's and conversed with the policeman

stationed there. They were not, however, successful in. locating Castillo who, as far as the record shows, did not return to the vicinity of Blue Island Avenue that night. According to Monaco, the two then left Tito's with the intention of returning to the police station but, as they passed the vacant lot at Blue Island and Cabrini, Salvi drove the car into the lot and they got out to search for the gun. As they started searching Monaco observed Arthur Gamino, whom he did not know, start to cross the lot. The time was approximately 3:30 A.M.

Returning now to defendant at the Maxwell Street station, it appears that his brothers left and that he remained at the station in the company of Eisner and Gherscovich. until approximately 3:00 A.M. when, at defendant's request, he was driven to and left at an Athletic Club known as the S.A.C. at Taylor and Miller Streets. This club is 1080 feet from the vacant lot in which Salvi and Gamino. were left searching and where the killing occurred shortly thereafter. After arriving at the club, defendant called his brothers again and requested them to bring him clean clothes as he did not wish to go home and frighten his family with the torn and bloody clothes he had on. Pursuant to his request, the two brothers previously referred to, accompanied by Lawrence Moretti, a third brother who was a court bailiff, drove to the club and brought clothes into which the defendant changed. The defendant testified that his brothers then drove away and left him, but it is the People's contention that such testimony is completely rebutted by the accounts given by eyewitnesses and ear-witnesses to the events which occurred within minutes after the brothers were admittedly assembled at the athletic club.

The versions of the shooting testified to by defendant and Monaco are in complete conflict in all material particulars. Thus, as the parties have done in their briefs, we shall detail them separately.

Defendant related that after his brothers left, he proceeded to walk toward Tito's with the intention of determining if there were any officers or other persons around who could give him information regarding his stolen revolver and the men who assaulted him. When he arrived at the intersection of Blue Island Avenue and Cabrini Street, he observed three men, whom he thought looked suspicious, in a bending position in front of a parked car which had its headlights lit. One of the men, who had a flashlight in his hand, straightened up and flashed the light on a gun in the other hand. When he saw the gun, defendant shouted: "Police-officer, stop," and ran toward them drawing the .38 caliber revolver he had earlier obtained from his brother as he did so. The three men said nothing but ran to an automobile parked in the vacant lot where one entered by the door on the left, or driver's side, and the other two by the door on the right. Defendant ran to the right hand door of the two-door car, swung it open and shouted: "Police-officer, step out of the car with your hands up." He then fired a downward shot which, it later developed, struck the bottom part of the open car door. At this time defendant was standing about three feet from the side of the car and immediately after he had fired the warning shot, a shot came from the car. He saw the flame of the gun, fired into the car, grabbed the hand of the man in the front seat who had fired the shot, twisted the hand, and struggled for possession of the gun. He did not know if he had hit anyone with his answering shot, nor did he remember if he kept shooting as he grappled for the gun. He did recollect, however, that there was a volley of shots fired. During the struggle for the gun, two men in the back seat of the car rose toward him, one of them with a knife. Things happened so quickly he did not remember if he had continued to fire after he had disarmed the man in the front seat, but he

stated that it was possible that he had fired both guns after obtaining the second one. On cross-examination, however, he testified that he did fire in the direction of the knife. After the shooting defendant ran into Blue Island Avenue where he endeavored to stop passing motorists in order to cause them to summon the police, but, when they failed to stop, he went to a store on Polk Street where he called the Maxwell Street station, reported the shooting, gave his name and badge number, and ordered ambulances.

The only other eye-witness to the shooting was Leonard Monaco, a 21-year-old unemployed laborer, who, as previously related, went to the lot with Salvi at 3:30 A.M. to continue the search for the missing gun. His version of the shooting was as follows: Just as Arthur Gamino was crossing the lot, Monaco, who was stamping in the weeds there, stepped on a gun which he picked up and handed to Salvi. It turned out to be the .32 caliber gun which Castillo had taken from defendant and thrown away. As he handed the gun to Salvi someone shouted: "Stop, or we'll shoot, its the police." Monaco turned around and saw five or six men, some of whom were armed and had gun belts on, approaching from the direction of Blue Island Avenue. One of the men took the gun from Salvi and another shouted: "Grab that fellow," meaning Gamino. When this was accomplished the men searched the three youths then put them into the back seat of Castillo's car. Gamino sat on the right of the seat, Salvi in the middle, and Monaco on the left. The men remained outside the car talking and arguing and someone said: "Who is going to take them to the station?" Defendant said he would do so, whereupon one of the other men said: "Promise me you won't hit the boys," and defendant replied that he would not. Some of the conversation at this time was in Italian, which the Moretti brothers admittedly could speak, and which Monaco could not understand.

After the conversation, four or five of the men walked

away toward the Avenue while defendant walked to the right side of the car, opened the door and inquired who the driver was. When Salvi replied that he was, defendant told him to get into the front seat and drive to the station. Salvi slid around Monaco and got in the front seat on the driver's side. After Salvi got behind the wheel, defendant put his head into the car through the open door and leaned with his left elbow resting on the top of the front seat and his right leg on the floor of the car. At this time one of the departing men called: "Promise me again you won't hit the boys," whereupon defendant withdrew his head and right hand from the car and, with the gun therein pointing downward and slightly forward toward the Avenue, fired a shot and shouted: "Get the hell out of here." This was the first time Monaco noticed the gun in defendant's right hand and he testified he could not see the left hand because it was below the top of the car seat. After the shot described was fired, Monaco heard one of the other men call: "Shoot the three of them in the head," and did not see or hear them after that.

Defendant then leaned back into the car in the leaning position previously described. At the time Salvi was in front, back of the wheel, Monaco was in the left rear corner, and Gamino in the right rear corner. In succession, defendant pointed his gun at each of the three and asked for their names, ages and addresses. After Gamino, the last to be questioned, had responded, defendant asked: "How did you kids know the gun was in the lot?" looking at Salvi as he did so. Without waiting for an answer defendant shouted: "Take that," and started shooting. He shot Salvi first, then turned his gun on Monaco who was sitting immediately behind Salvi. Monaco ducked down, trying to get out of the way, and realized after he got down that he was shot because of blood running down his face. As he was going down, defendant was firing at Gamino and, although Monaco was cross-examined ex-

tensively on the subject, he did not know in what position Gamino was sitting at the time. As Monaco crouched on the floor he heard other shots fired and, to the best of his judgment, heard 10 or 12 altogether. When the shooting subsided, Monaco remained down until he heard defendant shout: "Call the police, there's been a shooting here." Since the voice sounded far away he raised up to look out and, upon seeing defendant standing in Blue Island Avenue with a gun in either hand, he crawled out of the car crossing over Gamino's body as he did so. Monaco then ran to Tito's where he told the policeman stationed there that he had been shot by cops. The Maxwell Street station was notified and the wounded man taken to a hospital.

Officers who came to the scene of the shooting found the dead bodies of Salvi and Gamino in the car and subsequent medical examination disclosed that a bullet had passed completely through Salvi's head, the point of entry being just in front of the right ear and the point of emergence being a point beneath the left ear and the angle of the jawbone. Gamino's fatal wound was caused by a .32 caliber bullet which entered his body in the left chest, to the left of the breastbone, and proceeded on a slight left to right course. It was found in the body just beneath the angle of the right shoulder blade. Gamino also received two through-and-through wounds in the back, just beneath the skin, from bullets which entered from the left side and emerged through the right side. Monaco received wounds from one bullet which penetrated his left cheek, his lip and a finger, and from another which passed through his hand. Subsequent tests showed the presence of alcohol in the blood of Gamino and Salvi and although medical witnesses were of the opinion that it was not sufficient to intoxicate either decedent, a doctor testifying for the defense was of the opinion that in some cases the amounts of alcohol found could cause early stages of lessened inhibitions and emotional instability.

Mabel White, who lived on Cabrini Street across from the lot where the shooting took place, appeared as a witness for the People. She related that she had been awakened by her child around 3:30 A.M. of the morning in question and had returned to her bed. The windows in her room were open and, as she was lying there, she heard several voices talking for half a minute or a minute, but could not distinguish any words. She next heard a single shot and, after an interval of 15 seconds, heard a car start out. The next thing she heard, after another interval of about 15 seconds, was a series of shots and the squealing of automobile tires. Upon getting up and looking out the window she saw a man standing by a car in the vacant lot on the side opposite the driver's seat. He stood there, then walked to Blue Island Avenue where he tried to stop a car while shouting something about police and shooting. He then went north on Blue Island Avenue and passed from her view. About five minutes later, and for some time thereafter, the witness observed police cars coming to the lot but she did not leave the house or awaken her husband. On cross-examination it was brought out that this witness had not presented herself at any of the inquiries or previous proceedings, and she later stated her reason for not coming forward was fear for her children.

Another auditory witness to testify for the prosecution was Alex Valadez, 18 years old, who lived on Blue Island Avenue across the street from the vacant lot. He told of returning home from work at 3:15 A.M. and of being attracted by the sound of screeching auto tires shortly thereafter. Following this he heard a shot, then, after an estimated interval of 15 seconds, heard a series of shots which he counted up to five. Upon looking out a window he saw a man coming from the lot with a gun in his hand and heard something like: "Call the police." The witness remained at the window 25 to 30 minutes, saw the police arrive, and then went to the lot where he observed two

bodies in the car. He testified that he saw an unopened knife lying on the rear seat and that he saw a cigarette in the right hand of the body in the front seat. The witness did not mention the cigarette during preliminary investigations, or at the coroner's inquest, and, when cross-examined, stated he had not done so because nobody had questioned him about it, and that the recollection of it "came to him" just after the inquest. Police officers corroborated the presence of the unopened knife on the back seat of the car but stated they found no cigarette in Salvi's hand.

It appears that the Maxwell Street station received reports both of the shooting and of Monaco's appearance at Tito's in a wounded condition at approximately the same time. One car, bearing officer John McGough and his partner, was dispatched to Tito's and another, with Sergeant Patrick McInerney and officer Michael Buczek, to Blue Island and Cabrini. En route to Tito's, McGough saw defendant at Blue Island and Polk and was told by him: "I got my gun back, I had to shoot him, it is over in the vacant lot." McGough then told defendant that another car would answer his call and drove on to Tito's only to be told that the wounded man there had been taken to a hospital. When the squad car containing Sergeant McInerney and Buczek arrived at Blue Island and Polk Streets, defendant approached the sergeant and said: "Sarge, I shot three fellows and they are in that parking lot there and here are the guns I shot them with." The guns were .38 and .32 caliber revolvers and McInerney found that all six bullets in each had been fired. The men then started to the car with Buczek leading the way and when the latter, who had a flashlight, reported there were two men in the car, defendant stated he wanted to go to Bridewell Hospital. McInerney, seeing blood on defendant's shirt and underwear, thought he was shot too and so sent him to the hospital. The officers above referred to, and others, re-

mained at the vacant lot while crime and medical investigators performed their functions and, at the trial, gave testimony relative to the positions of the bodies, to the knife found in the rear seat, and to the steps taken to prevent the disturbance of the bodies by bystanders. In the meantime defendant was examined at Bridewell Hospital, was given medication for a headache, then taken to the Maxwell Street station.

Returning to Monaco, the record discloses that the officer on duty at Tito's caused him to be taken to a private hospital where he was treated for his wounds. About 5:00 A.M., Captain Patrick J. Groark, commanding officer of the Maxwell Street station, came to the hospital and obtained from Monaco a verbal account of the shooting in which he had been wounded. Groark's testimony at the trial reflects that the account then given by Monaco, immediately after the shooting, coincided in all material respects with the testimony he gave at the trial several months later. After learning what had occurred Groark took Monaco to the station where defendant and James A. Brown, the latter an assistant State's Attorney, were also present. Brown did not then question Monaco because of his mouth wound but, later in the day, obtained a written statement from him. In the days that followed, Monaco, who was kept in protective custody, testified at the coroner's inquest, at a bail bond hearing, and at the defendant's trials, and it is to be gathered from this record that he consistently gave the account of the shooting previously related. Additionally, he was called upon to view Lawrence Moretti, Salvatore Moretti, Vincent Moretti, Anthony Gherscovich and Edward Eisner, but was unable to say whether or not they were the persons he reported seeing with the defendant in the lot just prior to the shooting.

When Monaco was searched at the police station, he had on his person three white tablets and three yellow capsules. Upon analysis a police chemist found the tablets

to be phenobarbital, which was described as a hypnotic, or sedative, commonly used for coronary disease, nervousness and sleeplessness. The witness also stated that it was possible for the drug to be used for epilepsy, from which Monaco suffered, or as a withdrawal agent for narcotic addiction. The contents of the capsules found were not determined but the chemist did ascertain they did not contain a narcotic drug.

Despite persistent inquiries by investigating officials, defendant made no statement concerning the affray until some eighty-four hours after its occurrence and because of such fact his physical condition, both before and after the shooting, was brought to focus before the jury. The defense sought to establish that defendant suffered amnesia as the result of a brain concussion received in the fight and was neither physically nor mentally able to answer questions or make a statement during the time in question. The prosecution, pointing to the apparent normal manner in which defendant conducted himself in reporting and seeking to investigate the fight, contends that the amnesia was one of convenience which did not occur until after defendant learned there was a surviving eyewitness to the shooting. With regard to such issue, police officers who were with defendant and talked to him immediately following the fight at Tito's, stated that, while he showed outward signs of having been in a fight, his mental condition was good and he answered questions coherently and distinctly. Defendant himself testified that his physical condition was good after the fight and that while he might have had slight pains, that he gave no thought to medical attention. Of similar purport was defendant's testimony that he felt all right and physically capable of making an arrest when he took leave of his brothers at the athletic club immediately prior to the shooting. However, when Brown, the assistant State's Attorney, solicited defendant for a statement at 5:00 A.M., while the principal witnesses were both at the

Maxwell Street station, defendant complained of severe pains in the head and asked to be taken to a hospital. Because of defendant's complaints, Brown refrained from further efforts to get a statement at that time.

From the station defendant was taken to St. Anthony's Hospital and, although Brown visited him in the morning, afternoon and evening of the same day, no statement was given, it appearing that defendant was still being examined by doctors at the time of the first visit, that he pleaded he was not in physical condition to talk at the time of the second, and that he was sleeping and could not be aroused when the third visit was made. The morning of the following day, Saturday, August 25, Brown and other officials again sought to question defendant but his only responses were that he did not remember, that his "mind" was hurting him, that he felt sick, and that he would make a statement when he felt better. The medical diagnosis of defendant's condition while at St. Anthony's Hospital was that he was suffering from a cerebral concussion and the attending physician expressed his opinion at the trial that defendant was not in a fit physical or mental condition to make a statement on the morning of August 24, when Brown paid his first visit. Upon being questioned as to whether the defendant suffered amnesia, the doctor stated such a condition could follow a concussion, but failed to expressly state an opinion that such a result had occurred in defendant's case. The witness also stated that defendant was treated with morphine to ease his pain and explained that, in certain individuals, the drug could have the effect of impairing the functions of memory. At the same time, however, the doctor stated that defendant had answered all questions put to him coherently, though slowly, and was of the opinion that defendant was physically able to make a statement on Saturday morning, August 25.

It next appears that defendant departed from St. Anthony's Hospital, of his own free will and under his own

power, some time during Saturday afternoon. The record next places him in Bridewell Hospital where, on Monday morning, August 27, Brown again endeavored to question him. Defendant, however, stated he was sick and that he didn't know when he would be well enough to make a statement. In the latter regard, a doctor who had examined defendant just prior to Brown's visit, testified he found no evidence of a concussion and that, although defendant complained of a headache and dizziness, he answered questions intelligently, coherently and without difficulty. Early in the afternoon of the same day defendant conferred with his attorney and shortly thereafter gave Brown a statement by means of questions and answers. Defendant later recounted the fatal events to the grand jury, at the coroner's inquest, and at a bail bond hearing. For the most part, his statements coincided with the testimony given in this cause, the most notable exceptions being that he told the grand jury he did not know whether he had grabbed the gun from a man in the front seat or the back seat of the car, and that in all previous accounts he did not refer to any struggle preceding his seizure of the gun.

At the trial a number of witnesses testified to defendant's excellent record as a police officer, and to his general reputation for veracity, sobriety, peacefulness and lawabidance.

The first contention of the defendant to which we shall direct our consideration is that the verdict of the jury is "against the weight of the evidence." As a basis for such claim it is urged that the evidence does not establish beyond a reasonable doubt that defendant fired the shot which killed Gamino. In the alternative it is argued that the evidence discloses that the shooting of Gamino was done in self-defense. The question of how the victim's death occurred, together with the question of whether it occurred under circumstances justifying the application of

the doctrine of self-defense, are issues of fact and therefore particularly within the province of the jury to determine. From the facts previously detailed it may be seen that the evidence concerning the shooting was in direct and irreconcilable conflict. If the testimony of Monaco, defendant's chief accuser and the only eyewitness other than defendant, is true, the defenses advanced have no foundation and defendant was guilty of a deliberate murder. On the other hand, if the version of the defendant is accepted as the true one, we think it apparent that merit attaches to his claim of self-defense. In a criminal prosecution, however, it is the province of the jury, before whom the witnesses appear and testify, to decide, in cases where the evidence is conflicting and contradictory, as to what evidence and what witnesses shall be believed, and a reviewing court will not substitute its judgment for that of the jury unless mistake or prejudice of the jury is clear, or unless the defendant has not been proved guilty beyond a reasonable doubt. (*People* v. *McClain,* 410 Ill. 280; *People* v. *Gormach,* 302 Ill. 332; *Gainey* v. *People,* 97 Ill. 270.) Stated differently, the rule of the cited cases is that in a criminal proceeding the resolution of conflicting evidence and the determination of the credibility of witnesses is a matter exclusively within the province of the jury, whose finding will be given great weight, and it is only when a reviewing tribunal can say from a careful consideration of all the evidence that there is clearly a reasonable and well-founded doubt of the guilt of the accused, that it will interpose on the ground that the evidence does not support the jury's verdict.

In the present case the jury accepted the evidence presented by the prosecution as being the true version of the shooting and in so doing rejected the claim of self-defense and the theory that it was Salvi, rather than defendant, who fired the shot fatal to Gamino. The jury's choice

between the contradictory and conflicting versions put into evidence leaves for our determination only the question of whether there is sufficient credible evidence to prove defendant's guilt beyond a reasonable doubt. The record discloses that Monaco testified to a state of facts clearly showing that defendant committed a needless and deliberate murder under conditions which no reasonable person could believe would justify or necessitate self-defense. Defendant does not argue that Monaco's testimony lacks the necessary elements of murder or identification necessary to support the verdict of guilty but attacks Monaco, and other of the People's witnesses, as being unreliable persons of low antecedents and character. The law, however, admits to no concept that only men of pure character and habits are competent to speak the truth, (*Smith* v. *United States,* 161 U.S. 85, 40 L. ed. 626,) and, in effect, what defendant would have us do is to substitute our judgment of the credibility of the witnesses, Monaco in particular, for that of the jury. Aside from the fact that the jury was aware of the antecedents, habits and associations of the witnesses complained of when it made its choice between the conflicting versions, the argument of the defendant overlooks the consistency of Monaco's various statements made at times ranging from an hour and a half after the shooting up to and including his testimony at the trial, and the fact that his version was corroborated to some extent, and that of defendant contradicted, by the testimony of earwitnesses White and Valadez relative to the sequence of shots and to the hasty departure of a car just as the shooting occurred. Considering the record in its entirety, we find nothing in the background or testimony of the witnesses attacked which would justify the substitution of our judgment as to their credibility for that of the jury.

Defendant's chief argument under this point is that there is reasonable and well-founded doubt in the evidence as to whether he or Salvi fired the shot which killed

Gamino. Such a contention is, of course, predicated upon the assumption that defendant spoke the truth when he testified Salvi was armed with a gun while in the car, and that Monaco testified falsely when he said the gun they found in the lot was taken from Salvi prior to their entry into the car. The facts in evidence which defendant advances as creating reasonable doubt that he fired the shot fatal to Gamino are set forth in his brief substantially as follows: (1) that defendant was leaning into the car through the open right hand door with a .38 caliber revolver in his right hand; (2) that Gamino was then seated in the right hand side of the rear seat facing defendant; and (3) that Gamino was shot in the back with two .32 caliber bullets and in the chest with a third bullet of the same caliber. Upon the basis of such facts, it is contended that it would have been physically impossible for defendant to take the .32 caliber gun from Salvi with his left hand and to then contort his left wrist in such a manner as to shoot Gamino, who was facing him, in the back as well as the chest. Apart from the fact that the theory advanced depends upon the belief that Salvi was armed and that defendant struggled with him for a gun, matters within the province of the jury, we are in accord with counsel for the People that it likewise embraces the assumption of facts not in evidence and which may not be reasonably inferred. First, there is no evidence that defendant and Gamino maintained the fixed relative positions, above-described, while the actual shooting was going on; and, second, there is no evidence that the unrecovered bullets, which passed from left to right under the skin of Gamino's back, were of a .32 caliber. Absent such evidence, defendant's hypothesis that it would be impossible for him to shoot a person facing him in the back, becomes mere speculation.

More important, however, we are of the opinion that the theory advanced and the reasonable doubt claimed are

almost completely dispelled by defendant's own testimony and by other affirmative evidence in the record. Near the conclusion of his direct examination, defendant, when describing his struggle for the gun with the man in the front seat, gave testimony which has been fairly abstracted as follows: "I grabbed the wrist of the hand and whether I kept firing with the .38 or not I don't actually know. I know there was a volley of shots but I worked this gun loose and *as I got the gun loose that's when the two men in the back seat had come up* somewhere like this [indicating]. They were about this close [indicating] six or eight inches, something like that, from the top of the back seat about as close as you can get to it." (Emphasis supplied.) Thus by defendant's own version both he and Gamino moved from the fixed position upon which his theory of "impossibility" and claim of reasonable doubt is founded. Further, defendant testified on cross-examination that he fired into the back seat and admitted that he might have fired with both guns. As regards the last point, we note that in defendant's initial statement to Brown, he definitely stated twice that he had fired with both guns. Also to be recalled is that when Sergeant McInerney arrived at the scene of the shooting defendant said to him: "Sarge, I shot three fellows * * * and here are the guns I shot them with." Even if we were to find, contrary to the jury's determination, that defendant's version of the shooting was true, when the evidence discussed is considered together with the fact that Gamino received a fatal chest wound of a nature which makes it improbable that he would thereafter be able to move on defendant in a threatening manner, we are of the opinion that the record leaves no doubt that Gamino did not maintain a fixed position in the back seat, and that he received his fatal wound after defendant regained possession of the .32 caliber gun.

On consideration of all the evidence pertinent to defendant's present contentions, we conclude that both his

guilt and perpetration were proved beyond reasonable or well-founded doubt, and that the jury was correct in finding that he was not motivated by a reasonable necessity of self-defense.

Adverting to decisions of this court which hold that where the evidence is close the record must be free from substantial error, (*People* v. *Etzel,* 348 Ill. 223; *People* v. *Mulcahy,* 318 Ill. 332,) defendant argues that the judgment of conviction must be reversed because of substantial and prejudicial errors which occurred during the conduct of his trial. The first points made are that the court erred in excluding evidence (1) that Salvi was a narcotic addict, (2) that he was under the influence of alcohol during the affray, and (3) that he was of such turbulent and violent character as to be more likely to resist than to submit to arrest. Such evidence, it is urged, was material to defendant's claim that he was assaulted by Salvi and that Gamino was killed while defendant was exercising a right of self-defense, in that it bears upon the likelihood that Salvi would assault defendant and that he would have a motive for resisting arrest. The general rule, as stated in 40 C.J.S., Homicide, secs. 223, 274, is that evidence of the character and habits of a third person is inadmissible in such an action. An exception exists, however, where the circumstances of the homicide are such as to warrant the admission of evidence of such nature. In view of the fact that Salvi, the third person here, was a common victim in the homicide for which defendant is being tried, and in further view of the claim that Gamino's death occurred while defendant was exercising a right of self-defense against Salvi, it is our judgment that the circumstances render such evidence admissible, if properly presented, as bearing on the question of which person in the affray was the aggressor. See: 26 Am. Jur., Homicide, sec. 350; 64 A.L.R. 1047; *People* v. *Brindley,* 369 Ill. 486; *People* v. *Willy,* 301 Ill. 307; *Carle* v. *People,* 200 Ill. 494.

Recourse to the record shows that defendant sought to establish the character and habits of Salvi through the testimony of Edward Quinn, a Chicago police officer. After Quinn had testified he knew Salvi, in the latter's lifetime, and that he had met Salvi on June 21, 1950, fourteen months prior to the shooting, the court and counsel retired from the presence of the jury and defendant's counsel then submitted to the court a number of questions they proposed to put to the witness. One question was whether, after the witness had taken Salvi to the police station on June 21, 1950, the latter did not say to him "that he was a narcotics user and was in the habit of having a jolt in the morning and a jolt in the afternoon;" another, also bearing on narcotics, was whether or not Salvi was under the influence of drugs when the witness attempted to arrest him on the day named. Still other proposed questions related to the witness's knowledge of Salvi's general reputation for being a peaceful and law-abiding citizen, his general reputation for being a person of a quarrelsome, turbulent nature, and his character for willingness to submit to police interrogation or lawful arrest. As each question was recited, the court sustained objections made by the prosecution and, in view of such action, the witness was excused by the defense without further questioning when the trial was resumed before the jury.

In reply to the charge that evidence of Salvi's alleged narcotic addiction was erroneously excluded, the People first contend that the point was not preserved for review because defendant made no offer to prove what officer Quinn would have said if permitted to answer the questions propounded on the subject. From the state of the record, however, it is our judgment that such objection is met by *Creighton* v. *Elgin*, 387 Ill. 592, 606, and *Hartnett* v. *Boston Store of Chicago*, 265 Ill. 331, 337, where it is stated that if a question shows the purpose and materiality of the evidence, and if it is in proper form and clearly admits

of an answer relative to the issues, the party by whom the question is propounded is not bound to state the facts proposed to be proved by the answer unless the court requires him so to do. The questions here involved meet these requirements.

Counsel for the People next argue that evidence of Salvi's addiction was inadmissible when unaccompanied by evidence that Salvi was a dangerous and violent person when under the influence of narcotics, and by proof that he was under such influence at the time of the shooting. In reply the defense urges that it is a matter of common knowledge "that a narcotic addict, whether under the influence of narcotics or not, is far more likely to commit a crime of violence than he would be if he were not such an addict." As presented, therefore, defendant's argument infers that evidence of drug addiction, past or present, is, without more, admissible in a homicide action for the purpose of determining the aggressor.

Although we have found no precise authority upon the question as presented, analogies are at hand to guide us to a solution. In *State* v. *Williams,* 50 Nev. 271, 257 Pac. 619, where the defendant claimed self-defense, the court stated (p. 622): "* * * the fact that the deceased was a drug addict and that drug addicts are generally dangerous persons would not be competent evidence from which the jury could infer that the deceased was the aggressor or that the defendant's fear of the deceased was well grounded. We conclude that the trial court correctly ruled that such evidence would not be competent until the defendant had first established that the deceased was a violent and dangerous person." We interpret the concluding phrase to mean "violent and dangerous" because of the deceased's use of narcotics. Of similar purport is *Moseley* v. *State,* 89 Miss. 802, 41 So. 384. There, where the defendant claimed self-defense, the trial court permitted the introduction of evidence that the deceased was under the influ-

ence of cocaine at the time of the killing but refused to permit proof of the effect of cocaine on the deceased. The reviewing court said: "We adopt the conclusion of those authorities which hold that testimony is admissible of the character of the deceased when under the influence of cocaine. A man may be peaceful and quiet when sober, but a terror when affected by cocaine. There was testimony offered to show this, * * * and there is testimony sufficiently tending to show that deceased was under the influence of the stimulant * * *." Again, in *State* v. *Ricks,* 170 La. 507, 128 So. 293, another homicide case where the defendant claimed self-defense, the court had this to say in discussing evidence relative to the habits of the deceased: "Even if the habit of the deceased as to drinking and proof of specific acts were admissible, such evidence in the present case would be wholly irrelevant and immaterial, as there is no proof that deceased was intoxicated at the time of the homicide. His alleged turbulent and dangerous character, when under the influence of liquor on other occasions, is therefore beside the question."

Applying the principles of evidence adhered to in the cited cases, we are of the opinion that the proffered evidence of Salvi's alleged addiction was both irrelevant and incompetent when unaccompanied by any proof, or offer of proof, that he was still an addict at the time of the homicide fourteen months later, that he was dangerous and violent as a consequence of his addiction, that he was dangerous and violent when under the influence of narcotic drugs, or that he was under their influence at the time the homicide occurred. Even assuming that Salvi's addiction continued until the time of the homicide, we have found no authority, legal or medical, and none has been brought to our attention, which substantiates defendant's claim that the behavior patterns of addicts, with reference to violence and crime, are so predictable as to be matters of common knowledge and thus forestall the need for their

specific proof. Apart from the lack of authority to support the defendant's claims, it is our firm conviction that knowledge of the characteristics and tendencies of drug addicts does not come to the ordinary person who will be called upon to serve as a juror in the course of every-day experience. In the absence of foundation evidence showing that Salvi's use of drugs rendered him dangerous and aggressive and that his addiction continued at the time of the homicide, we conclude that the trial court properly excluded the evidence offered.

Defendant also makes the claim that evidence of Salvi's alleged addiction was admissible to show a motive for resisting arrest, particularly since our Criminal Code (Ill. Rev. Stat. 1953, chap. 38, pars. 192.29-192.32) subjects unregistered users of narcotics to arrest and imprisonment. Although such argument loses much of its force when it is considered that the registration statute did not go into effect until almost two years after the homicide, it is sufficient to point out that the proffered evidence was incompetent for such purpose in the absence of proof that Salvi was an addict at the time defendant sought to arrest him.

The action of the trial court in refusing to permit officer Quinn to testify as to Salvi's reputation for being a violent and turbulent person, who would be more likely to resist than to submit to arrest, is also urged to have been erroneous. Although much is said in the briefs of both parties on the question of whether or not defendant was the assailant, thus rendering admissible evidence of the vicious disposition of the victim, (See: *Cannon* v. *People,* 141 Ill. 270, 281; *People* v. *Brindley,* 369 Ill. 486, 491,) the ruling of the court must be sustained for the reason that there was no proof offered or given to show that the witness was qualified to give reputation testimony respecting Salvi. This court, on numerous occasions, has held that reputation witnesses must be shown to have adequate knowledge of the person queried about and that evidence of reputation,

to be admissible, must be based upon contact with the subject's neighbors and associates rather than upon the personal opinion of the witness. (*People* v. *Pieper*, 410 Ill. 15, 19; *People* v. *Shelton*, 388 Ill. 56, 63; *People* v. *Reeves*, 360 Ill. 55, 65; *People* v. *Rembowicz*, 335 Ill. 604, 615-16.) Up to the point officer Quinn's testimony was interrupted, all he had said was that he knew Salvi in his lifetime, having "met him on June 21, 1950, at 6:00 P.M. at Polk and Maplewood." From the questions which defendant's counsel said they wished to ask, it is fairly inferable that the officer had arrested Salvi on such date and that any testimony of Salvi's reputation would be based solely upon personal opinion, formed on the basis of one isolated instance, rather than upon knowledge gained through contacts with neighbors or associates of Salvi. Plainly, therefore, the witness did not meet the qualifications prescribed by this court before one can testify to another's reputation and, in the absence of a proper foundation, the exclusion of this segment of officer Quinn's testimony was not reversible error.

The next assignment of error is that the court erroneously excluded evidence that Salvi was under the influence of alcohol at the time of the affray. We find, however, (and defendant's argument under this point admits the fact,) that the court did permit a medical witness to testify that alcohol was found in Salvi's blood and to express the opinion that while the amount found would not create any functional body disturbance in an individual of Salvi's physical characteristics, it would, in a hypothetical person who had been reared in a certain society, cause a lessening of inhibitions. As the assignment of error is framed, therefore, it is refuted by the record. It is true, as counsel for the People have pointed out in meeting this claim, that the court sustained an objection to a question which inquired about the effect of the amount of alcohol found on the inhibitions of one addicted to the use of

narcotics. Inasmuch, however, as there was no evidence in the record then, or afterwards, tending to prove that Salvi was addicted to narcotics at the time of the shooting, the inquiry was wholly irrelevant and immaterial.

Although not in terms included in the assignments of error, defendant has extended his argument under the foregoing points to include a claim that the trial court erroneously excluded evidence that the fingerprints of Salvi and Castillo were on file in the Federal Bureau of Investigation. Such evidence, it is urged, reflected upon Salvi's character and motive for resisting arrest and served to discredit Castillo's story that the search for the gun was made in order to return it, and thus prevent the closing of Tito's tavern. The portion of the record upon which defendant's claim is predicated shows that during the cross-examination of Castillo, a witness for the People, the court sustained an objection to the following question: "And both your fingerprints and those of Salvi are on file at the B. of I. aren't they?" On the basis of established principles of evidence, we conclude that the court committed no error in sustaining the objection.

By a second group of alleged errors, defendant contends the court erred in excluding evidence (1) that Monaco was an epileptic; (2) that he was lavishly entertained by the State while in protective custody before the trial; and (3) evidence of statements Monaco made on radio interviews.

No argument, either as to law or fact, is presented in support of the third point, thus we may deem the error waived. *People* v. *Johnson,* 2 Ill. 2d 165, 167; *People* v. *Biloche,* 414 Ill. 504, 511; *United States* v. *Mansavage,* 178 Fed. 2d 812, 819.

With regard to the second contention made, the defendant brought out, through cross-examination of Monaco, that the witness was unemployed and that he had been living in a first rate hotel, together with a detail of eight police guards, for about three months prior to the trial,

without cost to himself. Further, Monaco testified that
nobody had given him money, that he expected none in
the future, that he had not been promised a job, that he
received visitors while at the hotel, and that he had attended
a stage play accompanied by three of his guards. He
denied that he had entertained twelve visitors on one occa-
sion. The court, however, sustained objections to a number
of questions which sought to elicit how much the witness
had paid for gifts for his mother and sister, whether he
had spent any of his own money for the hotel accommoda-
tions, whether hotel bills had been submitted to him, whether
he had an account and credit at the hotel, whether he trav-
eled in a hired car, and whether he had attended a New
Year's Eve party accompanied by his guards. It is defend-
ant's position that the evidence sought was admissible as
bearing upon Monaco's credibility, prejudice and bias in
that it would show he had been given material inducements
to testify. The trial court, however, gave as its reason for
limiting the inquiry, that Monaco's manner of living should
not be inquired into unless there was some possibility that
it might have affected his testimony and that this could not
be said to be the case when Monaco had consistently given
the same account of the shooting before the alleged influ-
ences and inducements started operating. In our judgment
his reasoning is sufficient to support his ruling. Further,
we have long been committed to the principle that the
latitude allowed on cross-examination in a criminal pro-
ceeding rests in the sound discretion of the court, and that
its rulings with respect thereto will not be disturbed in the
absence of a clear abuse of such discretion. (*People* v.
*Derrico,* 409 Ill. 453; *People* v. *Provo,* 409 Ill. 63; *Peo-
ple* v. *Moran,* 378 Ill. 461.) Specifically treating upon the
latitude of cross-examination designed to elicit facts tend-
ing to show bias, prejudice or friendship of a witness,
58 Am. Jur., Witnesses, sec. 715, has this to say: "Where
there is not a denial altogether of inquiry as to subjects

relied on to show bias, the scope and extent of the cross-examination for this purpose rests in the sound discretion of the trial court." Here there was no complete denial, for the defendant was permitted to establish that Monaco was living in the company of policemen at a hotel without expense to himself, and to elicit information as to whether he had been promised inducements, by way of money or a job, for his testimony. In view of such fact, together with the showing that Monaco's testimony was consistent with his account given immediately after the shooting when he could not have been motivated by such inducements, we are of the opinion that the court did not abuse its discretion in limiting the cross-examination as it did. Cf. *People* v. *Enright,* 256 Ill. 221, 232-233.

We now come to the first contention under this assignment of error, namely, that the court erred in excluding evidence that Monaco was an epileptic. As we interpret the pertinent portions of the record and the brief argument advanced, it is the defendant's contention that evidence of Monaco's affliction should have been admitted to test both his competency to testify and his ability to remember the events of the shooting. With regard to the first claim, this court pointed out in *People* v. *Enright,* 256 Ill. 221, 230, that if a party knows before trial that a witness is incompetent on account of mental condition, the objection must be made before he has given any testimony, inasmuch as it would be contrary to every rule of practice to permit parties to enter upon the determination, before the jury, of collateral questions as to the mental conditions of witnesses at the time of the trial. Although it is clear from the record that defendant had pretrial information of Monaco's illness, no objection was made to his competency to testify. Apart from the foregoing, this court ruled in the *Enright case,* (p. 229,) that it is no objection to the credibility of a witness that he is subject to epileptic fits, a decision which finds support in current medical views that epilepsy is not

to be equated with idiocy and insanity. (See: 50 Northwestern Law Review, 42, 56.) Insofar as Monaco's physical condition at the time of the shooting is concerned, there is no evidence in the record that he then suffered an epileptic seizure. Neither is there anything in his testimony, or its continuity, indicating that he was not able to give a correct account of what he saw and heard or that he did not do so. Absent evidence of such a seizure, it is our opinion that the court properly refused to permit hypothetical questions and medical testimony designed to inform the jury that the witness might have had a seizure and that its effect would be to destroy his memory for the incidents occurring during its duration. Defendant complains, however, that the court refused to allow him to determine if Monaco had a seizure when it sustained an objection to a question which inquired whether the witness had lost consciousness as a result of the excitement, anxiety and fear engendered by the shooting. While such a question might fall within the realm of proper cross-examination when standing alone, we find that it has been isolated from a series of approximately twenty questions dealing with the ultimate and unfounded suggestion that Monaco had suffered an epileptic seizure during the shooting and had fabricated his testimony on the basis of what he later learned from other sources. On the state of the record, therefore, we are of the opinion that the court did not err in sustaining the objection to the question now singled out. Apart from this, the question appears to elicit information as to whether the witness suffered a seizure after the shooting, a fact which would have little, if any, materiality in discrediting the witness's account of the events before and during the shooting. This is particularly true when it is remembered that defendant himself testified that the men in the rear were moving up on him when he fired into the back seat. Monaco could not have been moving to attack the defendant if he had lost consciousness.

It is also claimed the court committed reversible error in refusing to admit evidence that defendant was assigned to the narcotics detail. The record, however, as well as defendant's argument, discloses that his real complaint is more closely related to evidence of his official status immediately prior to the shooting. Although defendant admitted he was on furlough on August 23, 1951, he sought to testify that he was in Tito's on that date in the course of a narcotics investigation. The court, however, restricted his testimony to a statement that he was in Tito's tavern on "official business" giving as its reason that evidence of the precise nature of such business was not material to the question of whether defendant, several hours later, had killed with malice aforethought or in self-defense, and that such evidence would serve only to place prejudice in the minds of the jurors. Notwithstanding the court's ruling, we find that defendant was later permitted to testify that he had been given the description of a man named "George" during the course of his police work; that it was in connection with such information he went to Tito's on the night in question; and that he had learned from Navarro, one of the owners of Tito's, that it was George who assaulted him at the tavern and that George had in his possession ten pounds of either dope or marijuana. Accordingly, defendant was, in effect, permitted to communicate to the jury that he was at Tito's to investigate a narcotics peddler. On the state of the record, therefore, defendant's present claim may be held for naught, inasmuch as it has long been established that the rejection of evidence is not prejudicial error where the same or substantially the same evidence is admitted at some stage of the trial. (*People* v. *Jorczak,* 366 Ill. 507; *People* v. *Storer,* 329 Ill. 536; *People* v. *Sukdol,* 322 Ill. 540; *People* v. *Pizzo,* 362 Ill. 194; 24 C.J.S., Criminal Law, sec. 1918c.) The two authorities last cited reveal that the rule has its most frequent application where the same or substantially

the same evidence as that excluded is elicited from the same witness, including the accused. This was the circumstance in the present case.

The next error assigned by defendant is embodied in the claim that the court wrongfully excluded expert testimony that the bullets which killed Gamino could not have been fired by defendant. Aside from the fact that the questions proposed to be put to the experts assumed many facts not within the range of the evidence, it is held that if the subject is not one requiring peculiar skill and knowledge but is within the range of ordinary intelligence and observation, opinion evidence is not admissible. (*Hellyer* v. *People*, 186 Ill. 550, 558; *People* v. *Winn*, 324 Ill. 428, 442; *People* v. *Rongetti*, 338 Ill. 56, 63.) Whether defendant shot Gamino was one of the ultimate facts for the jury to determine. Under the circumstances of the case, when it is assumed by defendant's hypothesis that the deceased was in a certain position before he was shot, the defendant in another, and that both remained in their relative positions during the entire affray, it is a matter within the knowledge and observation of an ordinary person whether the accused could have fired a bullet taking a specified course in the body. The court did not err in this regard.

The prosecution introduced into evidence, without objection, a transcript of defendant's testimony before the grand jury and was permitted to read to the jury most of it, save the part where defendant claimed he was on a narcotics investigation. Although the record clearly shows defendant was given access to the same transcript, it is now urged that the court erred in refusing defendant's motion that the prosecution be required to produce a full and complete record of the grand jury proceedings, as well as all extrajudicial statements made by any and all witnesses in the case. Defendant has cited no authority in support of his argument "that when privileged or secret

minutes are partially disclosed, the full text must be disclosed," nor has any been found by this court. The import of *Cannon* v. *People*, 141 Ill. 270, *People* v. *Kraus*, 377 Ill. 539, and *People* v. *Borella*, 362 Ill. 218, is, however, that there is no duty on the prosecution to furnish the defense with transcripts of grand jury minutes or extra-judicial statements, and that a defendant is prejudiced in this regard only when he is denied access to such portions of the transcripts as are employed by the prosecution at the trial. No such denial as the assignment of error implies was made in this case.

The refusal of the court to give a jury instruction tendered by defendant is also assigned as error. This instruction was as follows: "You have no right to consider any other charge than that contained in the Indictment. The defendant is required only to meet the charge which is set forth in this Indictment and it is your duty to fairly and impartially consider the evidence relating thereto." It is asserted that without this instruction a jury might find that even if defendant did not kill Gamino, he killed Salvi and wounded Monaco and therefore deserved to go to prison. We find, however, that given instruction No. 10, advised the jury that it was incumbent upon the prosecution to prove beyond a reasonable doubt every material allegation of the crime of murder charged against defendant by the indictment, such material allegations being (1) that defendant, with malice aforethought, assulted Gamino with a revolver; (2) that, with malice aforethought, defendant discharged bullets into the body of Gamino inflicting mortal wounds; (3) that Gamino died as the result of such wounds; and (4) that Gamino was in the peace of the People at the time of the assault. The instruction concluded with the injunction that if the prosecution failed to prove any of said allegations, it was the duty of the jury to find defendant not guilty. It is thus to be seen the jury was fully instructed that its consideration was

limited to the charge of the indictment and that said charge was that defendant had murdered Gamino. Where instructions sought by a defendant are adequately covered by others given, there is no error in refusing the requested instructions. *People* v. *Grundeis,* 413 Ill. 145; *People* v. *Tilley,* 411 Ill. 473; *People* v. *Rife,* 382 Ill. 588; *People* v. *Mason,* 301 Ill. 370.

Although the court granted the defense great latitude in the *voir dire* examination of veniremen, it refused to permit defendant's counsel to inquire whether they had read a series of articles and editorials in a specific Chicago newspaper. It is here asserted that this restriction was an abuse of discretion which seriously prejudiced defendant's right to trial by jury. The rule was laid down in *Donovan* v. *People,* 139 Ill. 412, that the nature and extent of the examination of jurors is ordinarily left to the sound discretion of the court, and that it should be confined to a legitimate inquiry into the particular matter under investigation and take range enough only to put the court and counsel in possession of such material matters affecting the jurors as will enable them to act intelligently in the selection of the jury. (See also: *People* v. *Kroll,* 315 Ill. 115.) In the present case the court did not prohibit counsel from inquiring whether the prospective jurors read newspapers, or whether they had formed an opinion of guilt from what they had read, but only from inquiring as to whether they were readers of a specific newspaper. We are of the opinion that the trial court might properly have permitted these inquiries. However, we agree with the court and counsel for the People that the restriction imposed did not preclude counsel from acting intelligently in the selection of the jury. Despite the court's ruling, counsel was still able to ascertain if the jurors were biased or prejudiced as a result of reading "newspapers," which term would necessarily include the specific newspaper defendant sought to inquire about. Where there is no show-

ing that counsel was prevented from disclosing any facts or reason why a prospective juror might be biased or unqualified, it is not error to limit the extent of the juror's examination. (*People* v. *Pers,* 362 Ill. 298.) The narrow restriction here imposed by the court did not operate to prevent such pertinent disclosure.

The defendant next makes the blanket claim that the cumulative effect of numerous other allegedly erroneous rulings of the court was such as to surcharge the trial with an atmosphere of hostility against him. We have thoroughly examined the scattered and isolated events of the trial upon which this assignment of error is based and find nothing to sustain it. When the entire record is considered it demonstrates the trial was conducted with the utmost caution and fairness, and that the presiding judge was actively conscious of his duty to prevent prejudice or bias in the minds of the jury.

As a final assignment of error, defendant contends all the excluded evidence hereinbefore discussed was competent and admissible on the matter of the penalty to be imposed upon him should he be convicted. He refers, in his argument, only to the testimony that he was in Tito's on a narcotics investigation, saying that if the jury knew he was on such a "hazardous mission" it is not likely they would have imposed a life sentence. No argument or authority is presented, however, to show how any of the excluded evidence was material and relevant upon the question of penalty. It is stated in *Nowacryk* v. *People,* 139 Ill. 336, 343, that the evident design of the statute making murder a crime, "* * * is, that the punishment shall be proportioned to the turpitude of the offense, and it follows that evidence having a direct and legitimate bearing upon that question should be given to the jury, so as to enable them to fix the punishment understandingly and justly." It follows in the present case that whether defendant was in Tito's on a narcotics investigation or merely on "official

business" has no bearing upon the turpitude of the offense he committed several hours later. We agree with the People that a defendant has no right to introduce evidence legally immaterial and irrelevant under this test simply because it might cause a jury to feel more kindly disposed toward him.

We conclude that defendant has had a fair trial, free from prejudicial error, and that the verdict of the jury is supported by sufficient credible evidence. We are not, therefore, warranted in interfering with the judgment of the trial court and the same will be affirmed.

*Judgment affirmed.*